[Crim. No. 11543. In Bank. Feb. 25, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. THOMAS
LEROY TEALE, Defendant and Appellant.

Nels B. Fransen, under appointment by the Supreme Court, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Michael H. Fabian, Deputy Attorneys General, for Plaintiff and Respondent.

SULLIVAN, J.—In an indictment found on November 16, 1962, defendant Thomas Leroy Teale and Ruth Elizabeth Chapman were accused of robbery (Pen. Code, § 211), kidnaping for the purpose of robbery (Pen. Code, § 209); and murder (Pen. Code, § 187). After a joint trial by jury each was found guilty of robbery in the first degree, simple kidnaping (a lesser offense included within the offense charged), and murder in the first degree. As to the murder count the jury imposed the penalty of death upon defendant Teale and the penalty of life imprisonment upon Mrs. Chapman. On appeal this court affirmed the judgment as to defendant Teale; as to Mrs. Chapman the judgment was reversed insofar as it imposed punishment for robbery and kidnaping and affirmed in all other respects. (*People* v. *Teale* (1965) 63 Cal.2d 178 [45 Cal.Rptr. 729, 404 P.2d 209].)

The United States Supreme Court granted certiorari (*Chapman* v. *California*, 383 U.S. 956, 957 [16 L.Ed.2d 300, 86 S.Ct. 1228]) and reversed the judgment, holding that error in the trial resulting from a violation of the rule in *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] required that a new trial be had because the state had failed to show that such error was harmless beyond a reasonable doubt. (*Chapman* v. *California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].) Pursuant to this mandate we recalled our remittitur, vacated our decision, and reversed the judgments.

On April 18, 1967, upon motion of the prosecutor, separate trials were granted,[1] and the kidnaping count was dismissed. The retrial of defendant Teale commenced on May 16, 1967, and on May 29 the jury found him guilty of robbery in the first degree and murder in the first degree. The penalty on the murder count was again fixed at death. This appeal is automatic. (Pen. Code, § 1239, subd. (b).)

---

[1] Mrs. Chapman was subsequently tried and found guilty of first degree murder and first degree robbery and received concurrent life sentences. Upon appeal the robbery sentence was set aside and the judgment was affirmed in all other respects. (*People* v. *Chapman* (1968) 261 Cal. App.2d 149 [67 Cal.Rptr. 601].)

Viewing the record in the light most favorable to the People (*People* v. *Sweeney* (1960) 55 Cal.2d 27, 33 [9 Cal.Rptr. 793, 357 P.2d 1049]; *People* v. *Caritativo* (1956) 46 Cal.2d 68, 70 [292 P.2d 513], cert. den. 351 U.S. 972 [100 L.Ed. 1490, 76 S.Ct. 1042]) as we are bound to do following a guilty verdict, it discloses that defendant and Mrs. Chapman, living as man and wife, were constant associates during more than a month preceding the date of the alleged crimes. On September 15, 1962, they rented a cabin in Lake County and remained there until October 10. Two days later they were in Reno, Nevada, where Mrs. Chapman purchased a .22 caliber revolver and a .32 caliber automatic pistol. Apparently they then travelled to Las Vegas and, returning to California on October 17, registered at a motel in Fresno as man and wife.

During the evening of October 17, defendant and Mrs. Chapman appeared at a tavern in Lodi known as Croce's. After they had remained there for some three hours and had consumed two or three beers apiece, a disagreement arose between them and Mrs. Chapman went out of the tavern. After a few minutes she returned and said to defendant "Come on, let's go, we are not going to do anything here," or "Let's go, we can't do anything here." Thereupon they left the tavern. It was then approximately 1 a.m. on October 18, 1962.

About 1:35 a.m. defendant and Mrs. Chapman arrived at the Spot Club, another tavern in Lodi. A few minutes before closing time they and two men, never produced as witnesses, were the only persons left in the tavern except for the bartender, one Billy Dean Adcock.[2] Shortly thereafter Adcock was observed locking the door to the tavern, the lights of which had been turned off as was customary upon closing. With him were a man and a woman; the man had a coat draped over his right hand and stood behind Adcock.

About 9 a.m. on October 18, the owner of the Spot Club found Adcock's automobile parked at the front entrance. Upon entering he found that Adcock had not attended to his usual tasks before closing and that the tavern was in an unusual state of disorder. The drawers of the cash register had been removed and approximately $260 was missing.

Later that morning the body of Billy Dean Adcock was discovered in a roadside ditch north of Lodi. There was blood on his face and on the gravel alongside the road. Taken from

---

[2]The witness testifying to the above stated that he left the tavern at 1:58 a.m. by the clock of the tavern and that that clock was kept about 10 minutes fast.

the water near the body were personal papers of the victim, his wallet, a woman's lipstick, and a check for $2.00 signed by Ruth Elizabeth Chapman. The wallet contained no money, although Adcock had had between $50 and $65 on his person when he left for work on the previous day.

Adcock had been shot in the head three times with a .22 caliber revolver. Two of the bullets had entered through a single wound on the left side of the head and powder burns indicated that the gun had been within 2 inches of the victim's head when these bullets were fired. The third bullet had entered at the back of the head and powder burns indicated that the gun was about 18 inches away when this bullet was fired. The time of death was estimated at 2 a.m. on October 18, 1962.

At 4:40 a.m. on October 18, a man and a woman registered at a motel in Woodland as Mr. and Mrs. T. L. Rosenthal of Eureka, California. They arrived in Mrs. Chapman's automobile but gave a false license number. The handwriting on the register was Mrs. Chapman's.

About November 2, 1962, agents of the Federal Bureau of Investigation in New Orleans, Louisiana, received a teletype communication that defendant, whose parents live in New Orleans, was wanted in California for murder, kidnaping, and robbery. The communication also contained a description of Mrs. Chapman's automobile, in which the pair had been traveling on the night of the alleged crimes. The agents discovered the car in the vicinity of the residence of defendant's parents. They then observed defendant entering the vehicle and arrested him. While he was being fingerprinted at Bureau headquarters the agents told him that he was wanted in Stockton, California; he replied that they would have a hard time proving that he had been there. Defendant also mentioned Lodi although no reference had been made to that city by any of the agents.

When arrested defendant had on his person the .32 caliber automatic pistol which Mrs. Chapman had purchased in Reno on October 12. At the scene, the agents also made a perfunctory search for additional weapons of Mrs. Chapman's automobile in which defendant was sitting at the time of his arrest. The search yielded no weapons, and after defendant had been taken away for booking, an agent drove the car to a garage used for the storage of F.B.I. vehicles. There the agent parked the vehicle, locked it, and instructed the attendant to

see that it was not tampered with.[3] The car remained in the garage until November 5, when California officers arrived to take possession of it. At that time the vehicle was sealed and placed in a sealed boxcar for transportation by rail to California. On November 12, after the automobile had arrived in California, the seals were broken and a criminalist undertook a scientific examination which produced real evidence indicating that Adcock was inside the automobile when he was shot.[4] At no time was a search warrant obtained.

While confined in the San Joaquin County jail awaiting trial defendant had several conversations with another inmate concerning the crime. In the first of these conversations he stated "that he hoped Ruth wouldn't break down [because] they didn't have nothing on him." On another occasion defendant stated to the other inmate that "he hoped Ruth didn't break down, he said he knew he had it, but he said he hoped she didn't get in any trouble. . . ." Defendant also recounted to the inmate the circumstances of the killing. As the latter testified: "Well, he said they stopped the car and Mr. Teale said he was just—he said he had no intending to murder him, said he was just going to run him up through the grape vineyard and give them a chance to get away. Q. Did he say anything else? A. He said when he got out of the car, he says Mrs. Chapman, he called her Ruth, said Ruth shot him and then when he run around there and opened the door, said she shot him two more times in the head. Q. Did he mention anything about the weapon itself that was used? A. He said nobody'd ever find it."

Defendant presented no evidence in his own behalf either at the guilt phase or the penalty phase of the trial.

Defendant first contends that the evidence is insufficient to

[3]Although the record is not explicit on the point, it appears that the actions of the F.B.I. in seizing and securing the vehicle were undertaken at the request of California authorities. The agent who placed the car in the garage testified that "my job was to make sure the car was secured." Another agent who had participated in the arrest testified that he observed various articles of clothing and other items in the car but that he did not examine them at the time because "we were told not to touch anything." Finally, one of the California officers who took possession of the vehicle testified that "one of the first things that we did relative to the investigation [upon arrival in New Orleans], we went to the Federal Bureau of Investigation's garage and viewed a 1961 white Ford *which was secured for us as evidence*." (Italics added.)

[4]Blood of the victim's type was found spattered on the right interior of the automobile. A man's jacket and shirt bearing the same type of blood were also found. Fibers discovered on the victim's shoes matched those of the floormats of the vehicle. Traces of red paint were detected on the floormat and also on the victim's shoes.

support the verdicts. He points out that the case against him was based upon circumstantial evidence and that there were no nonparticipant eyewitnesses to the robbery and murder of the victim, Billy Dean Adcock. ■ It is clear, however, that the prosecution's reliance on circumstantial proof and the lack of eyewitnesses do not of themselves render adverse verdicts invalid for want of evidentiary support. "The People, of course, may rely on circumstantial evidence to connect the defendant with the commission of the crime charged and to establish beyond a reasonable doubt that he was the perpetrator thereof. [Citations.] ■ Moreover, 'It is the trier of fact, not the appellate court, that must be convinced of a defendant's guilt beyond a reasonable doubt. ■ If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' (*People* v. *Robillard* (1960) 55 Cal.2d 88, 93 [10 Cal.Rptr. 167, 358 P.2d 295, 83 A.L.R.2d 1086].)" (*People* v. *Hillery* (1965) 62 Cal. 2d 692, 702 [44 Cal.Rptr. 30, 401 P.2d 382].) ■ "The court on appeal 'will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. . . .'" (*People* v. *Newland* (1940) 15 Cal.2d 678, 681 [104 P.2d 778].)

■ In the instant case there was ample evidence upon the basis of which the jury could reasonably have found defendant guilty of each of the charged crimes. Thus, there was evidence from which the jury reasonably could have inferred that defendant and Mrs. Chapman, armed with pistols purchased by the latter. remained at the Lodi tavern until it was closing time and they were alone with the bartender; that they then proceeded to take money from the cash register, and, holding the bartender at gunpoint, forced him to lock the tavern and leave with them in Mrs. Chapman's car; and that they subsequently shot and killed the bartender. took money from his wallet, and, leaving the body in a roadside ditch, fled to other states. Defendant makes no effort to show that the above inferences lack support in the evidence or are otherwise unwarranted; instead he would have us draw contrary inferences from the evidence. This, as we have pointed out above, we may not do.

■ Defendant next contends that his constitutional

rights were violated by the admission into evidence of testimony and exhibits obtained as a result of extrajudicial statements made by Mrs. Chapman without the benefit of the warning required in *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. Mrs. Chapman made the statements in question after she was arrested by the F.B.I. in St. Joseph, Missouri. The information thus furnished was utilized to locate witnesses who testified at defendant's trial in respect to Mrs. Chapman's purchase of the two pistols in Reno on October 12, as well as to the couple's registering together at the Fresno motel on the day before, and at the Woodland motel on the day of, Adcock's murder.

The People concede that the statements obtained from Mrs. Chapman after her arrest were not prefaced by the warning provided for in *Miranda*. They contend, however, that, even if the failure to give the warning rendered the statements and evidence obtained as a result thereof inadmissible *against Mrs. Chapman,* the admissibility of such evidence[5] *against defendant* was not thereby affected. The point is well taken ■ As we recently held in *People* v. *Varnum* (1967) 66 Cal.2d 808, at page 813 [59 Cal.Rptr. 108, 427 P.2d 772]: "[I]n the absence of [coercive tactics offending due process], there is no basis for excluding physical or other nonhearsay evidence acquired as a result of questioning a suspect in disregard of his Fifth and Sixth Amendment rights when such evidence is offered at the trial of another person." ■ Since there has been no claim advanced that the subject statements were wrested from Mrs. Chapman by means of coercive tactics, defendant's contention must fail.[6]

Moreover, even if we assume for the sake of argument that the *Varnum* principle alluded to above is here inapplicable, it appears, as the trial court found, that all of the evidence complained of would have been discovered anyway by the authorities independently of Mrs. Chapman's statements through other evidence uncovered by them prior to her arrest. (See *People* v. *Chapman, supra,* 261 Cal.App.2d 149, 167-

[5]Mrs. Chapman's statements themselves were not offered in evidence against defendant.

[6]We reject defendant's suggestion that we overrule *Varnum* on this point. We also reject his argument that *Varnum* is inapplicable in the instant case because the jury was instructed on a conspiracy theory of criminal liability (see *People* v. *Durham* (1969) *ante,* pp. 171, 181-182 [74 Cal.Rptr. 262, 449 P.2d 198]) and "if a co-conspirator's rights are violated his fellow conspirator should be able to take advantage of this. . . ." This novel argument finds even less support in logic than it does in law.

168.) ▮ In these circumstances we must conclude that whatever taint might have attached to the subject evidence by means of illegal police conduct was dissipated by the independent information "which [broke] the causal chain linking the illegality and evidence in such a way that the evidence [was] not in fact obtained 'by exploitation of that illegality.' " (*People* v. *Sesslin* (1968) 68 Cal.2d 418, 428 [67 Cal. Rptr. 409, 439 P.2d 321] ; see also *Wong Sun* v. *United States* (1963) 371 U.S. 471, 484-486 [9 L.Ed.2d 441, 452-454, 83 S.Ct. 407] ; *People* v. *Thomsen* (1965) 239 Cal.App.2d 84, 90-91 [48 Cal.Rptr. 455].)

▮ We now turn to defendant's claim that the scientific examination to which the criminalist subjected Mrs. Chapman's automobile upon its return to California constituted an unreasonable search and seizure in violation of his rights under the Fourth and Fourteenth Amendments, and that the evidence obtained as a result of that examination was therefore inadmissible.[7] As we have indicated above, no search warrant was obtained and the scientific examination was undertaken 10 days after defendant's apprehension and at a place far removed from the scene of his arrest. These factors, it is urged, render the examination unreasonable under the rationale of *Preston* v. *United States* (1964) 376 U.S. 364 [11 L.Ed.2d 777, 84 S.Ct. 881], and *People* v. *Burke* (1964) 61 Cal.2d 575 [39 Cal.Rptr. 531, 394 P.2d 67]. (See also *Dyke* v. *Taylor Implement Mfg. Co.* (1968) 391 U.S. 216 [20 L.Ed.2d 538, 88 S.Ct. 1472].)

We have concluded that in resolving the question of the legality of the scientific examination of Mrs. Chapman's automobile and of the admissibility of the criminalist's testimony in respect thereto, *Preston, Burke,* and the myriad of cases spawned by them are inapplicable since such scientific examination constituted neither a search nor a seizure within the meaning of the Fourth Amendment.[8]

As we have indicated above, two objects in defendant's possession and control were seized and taken from him when he was arrested. The first was a .32 caliber automatic pistol, which upon subsequent examination was shown to be one of those purchased by Mrs. Chapman in Reno six days prior to

---

[7]Defendant does not contend that the search of the automobile for weapons at the scene of the arrest was in violation of his rights.

[8]"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." (U.S. Const., Amend. IV.)

the murder of Adcock. The second was *the automobile itself*, of which subsequent examination showed Billy Dean Adcock to have been an occupant at the time he was shot. Clearly the seizure of both of these objects was incidental to the arrest of defendant. Both were seized as evidence connecting defendant with the alleged crimes. Both could have been introduced at trial as evidence. We can conceive of no reason why a distinction should be drawn between these two evidentiary objects on the basis that one is an automobile. Since it is plainly within the realm of police investigation to subject objects properly seized to scientific testing and examination (see *People* v. *Rogers* (1966) 241 Cal.App.2d 384, 388-390 [50 Cal. Rptr. 559]), defendant cannot reasonably contend that such testing and examination was in derogation of his Fourth Amendment rights, and that evidence obtained thereby was therefore inadmissible. Considerations relating to the effectiveness of the examination, such as those based upon the chain of control of the evidence after seizure, are properly presented at trial and bear upon the weight of the evidence.[9]

We do not consider that our conclusion on this point evolves from novel principles. In our recent case of *People* v. *Webb* (1967) 66 Cal.2d 107, at footnote 3 on pages 123-124 [56 Cal.Rptr. 902, 424 P.2d 342], we reviewed four cases, two from this state, and, concluding that they represented "[a] further qualification of the *Preston* rule," went on to summarize their rationale as follows: "The implication is that when the police lawfully seize a car which is itself *evidence* of a crime rather than merely a container of incriminating articles, they may postpone searching it until arrival at a time and place in which the examination can be performed in accordance with sound scientific procedures." We today make explicit what we recognized by implication in *Webb*.

We here undertake a brief review of three of the cases mentioned in the indicated portion of the *Webb* opinion. Although there are factual differences between each of these cases and the case at bar, and although the reasoning supportive of each decision is in some respects wanting in clarity. we nevertheless consider them instructive insofar as they mani-

[9]In this case the defense, through cross-examination of prosecution witnesses, raised questions for the consideration of the jury as to the adequacy of precautions taken to assure that the automobile was in the same condition at the time and place of examination as it was at the time and place of arrest. Further, upon cross-examination of the criminalist the defense availed itself of the opportunity to question the effectiveness of the tests utilized by him.

fest recognition of the principle with which we are here con cerned.

In *People* v. *Miller* (1966) 245 Cal.App.2d 112 [53 Cal Rptr. 720], disapproved on another ground in *People* v. *Doherty* (1967) 67 Cal.2d 9, 14-15 [59 Cal.Rptr. 857, 429 P.2d 177], prosecution evidence tended to show that defendant had killed her husband by setting fire to an automobile which he occupied. After the fire had been extinguished officers first removed a gas can from its position on the floor behind the driver's seat, then had the automobile towed to a garage about five miles away where other objects were taken from it. Thereafter "[f]urther examination of the car was made from time to time by the officers." (245 Cal.App.2d at p. 139.) Defendant was arrested some four hours after the car had been removed to the garage. At the trial the prosecution introduced a substantial amount of evidence based upon the detailed examination of the automobile by criminalists. On appeal the court, assuming for the purpose of argument that the examination of the automobile at the garage constituted a "search" within the meaning of the Fourth Amendment, held that no violation of the *Preston-Burke* rule had occurred because detailed scientific examination of the automobile, which was necessary in order to determine the cause of the fire, was not feasible at the scene, a public street, due to reasons of technical inconvenience and the possibility of tampering at the hands of "an inquisitive public." (245 Cal. App.2d at p. 140.) Following these conclusions, which clearly anticipated our decisions in *People* v. *Webb, supra,* 66 Cal.2d 107 and *People* v. *Williams* (1967) 67 Cal.2d 226 [60 Cal. Rptr. 472, 430 P.2d 30], the court stated: "The situation is analogous to that where a person suspected of homicide is found in possession of a gun. It has never been held that a search warrant is necessary to enable the police to test that gun by firing bullets from it to determine if the gun was the one used in the killing." (245 Cal.App.2d at p. 140.)

In *People* v. *Talbot* (1966) 64 Cal.2d 691 [51 Cal.Rptr. 417, 414 P.2d 633], police officers, after discovering the victim's mutilated body, proceeded to defendant's residence and found parked nearby an automobile which appeared to have bloodstains on the right rear fender and trunk as well as in the bumper area. Defendant was arrested and the car was seized and removed, presumably to a police impound, after the trunk area thereof had been sealed. Several days later the seals were broken, the trunk was opened, and a scientific

examination thereof was undertaken. Objection to evidence obtained as a result of such examination, which evidence tended to show that the automobile had been used to dispose of the victim's body, was made on the basis of *Burke,* but we concluded that there was no error because the discovery of blood on the automobile, ''in conjunction with the surrounding circumstances, warranted a reasonable search of the entire automobile, and it was proper to seal the trunk area for a later, more scientific examination as a part of the reasonable search process.'' (64 Cal.2d at p. 708.) Following this conclusion, which again foreshadowed our *Webb* and *Williams* cases, we stated: ''Under the circumstances, the sealing of the trunk was the initial step taken in the process of the scientific investigation, and the actions of the authorities with reference to the automobile were proper.'' (64 Cal.2d at p. 709.)

Finally, in *Johnson* v. *State* (1965) 238 Md. 528 [209 A.2d 765], the prosecutrix had been abducted by four men in an automobile and subsequently raped by each of them on the back seat. Three of the defendants were arrested while riding in the automobile; a brief search of the car at the scene disclosed a revolver under the seat and the victim's coat and purse in the trunk. The officers, however, ''did not touch anything, leaving the articles for further investigation.'' (238 Md. at p. 538.) After defendants had been removed in a patrol car their vehicle was towed to the police station where a further search of it produced another gun and additional belongings of the victim. Three days later officers took sweepings and dust samples from the interior of the vehicle which formed the basis of evidence at trial to the effect that the prosecutrix had occupied it.

The court, rejecting the contention that evidence resulting from examination of the vehicle at the police station was inadmissible under *Preston,* noted that here, ''unlike in *Preston* . . . . the automobile, according to the information previously given by [the prosecutrix] which the officers had reasonable cause to believe to be true, had been used as an instrument in the perpetration of the alleged crime; [the prosecutrix] stated that she had been raped in the back seat. The coat and purse had been seen in the trunk of the car at the time of the arrest and could legally have been seized at that time. Where there has been a valid arrest, property found in connection with the arrest which tends to establish the commission of the crime charged may be held by the officers for evidence. If the arrest is lawful, the seizure is lawful, if the property is of an evi-

dentiary nature. [Citations.] The automobile itself could have been offered in evidence at the trial. Having lawfully seized it, the police had the right to examine it after the seizure for evidence in connection with the crime. In any event, the sweepings and dust samples were introduced to show that [the prosecutrix] was in the car and to place the car at the scene of the alleged rape." (238 Md. at pp. 539-540.) (See also *Trotter* v. *Stephens* (E.D. Ark. 1965) 241 F.Supp. 33, 41-42, affd. 361 F.2d 888.)

▮ The principle which we distill from the foregoing cases, and which is applicable to the instant case, is simply this: When officers, incidental to a lawful arrest, seize an automobile or other object in the reasonable belief that such object *is itself evidence*[10] of the commission of the crime for which such arrest is made, any subsequent examination of said object undertaken for the purpose of determining its evidentiary value does not constitute a "search" within the meaning of the Fourth Amendment. ▮ Thus, that evidence in the instant case which was obtained as a result of the criminalist's examination of Mrs. Chapman's automobile was properly admissible.

As suggested above, we do not consider that our decision herein is in conflict with, or in any way casts doubt upon, the decisions of the United States Supreme Court in *Preston*[11] and of this court in *Burke*. In those cases the automobile searched clearly had not been seized incident to lawful arrest as evidence of the crime for which the arrest was effected. Nor has our decision today been reached in ignorance of the proceedings in *Harris* v. *United States* (D.C. Cir. 1966) 370 F.2d 477 [125 App. D.C. 231], cert. granted 386 U.S. 1003 [18 L.Ed. 2d 432, 87 S.Ct. 1353], affd. 390 U.S. 234 [19 L.Ed.2d 1067, 88 S.Ct. 992].[12] Careful consideration of the opinions therein,

[10]The italicized language is crucial. We think it clear that the Constitution does not permit the seizure incident to arrest of an object merely because it is reasonably believed to be a *container* for evidence of the charged crime. Only an object reasonably believed to be *itself evidence* of the charged crime is subject to seizure and, therefore, to detailed examination subsequent to seizure.

[11]The frequency and resourcefulness of decisions distinguishing *Preston* (see generally Annot., 19 A.L.R.3d 727) has in the past led some to conclude that it is no longer of vitality. (See, e.g., dissenting opinion of Douglas, J. in *Cooper* v. *California* (1967) 386 U.S. 58, 62-65 [17 L.Ed.2d 730, 733-735, 87 S.Ct. 788].) However, the recent decision in *Dyke* v. *Taylor Implement Mfg. Co., supra*, 391 U.S. 216, has laid such speculation to rest.

[12]In *Harris* defendant was arrested for robbery and the automobile used by him as a getaway car was seized as evidence in the case after a

and especially of the panel opinion prepared by Judge J. Skelly Wright, has not altered our conviction that the rationale adopted by us today is sound in logic and in law, and consistent with constitutional guarantees.

 Finally, we observe that, even if the scientific examination undertaken on November 12, 1962, is considered a "search" within the meaning of the Fourth Amendment, that search was clearly reasonable in light of the totality of circumstances as a "continuation of the search lawfully begun at the time and place of arrest." (*People* v. *Webb, supra,* 66 Cal.2d 107, 126; see also *People* v. *Williams, supra,* 67 Cal.2d 226, 229-231.) Although this case involves an unusually wide separation in space and time between the commencement of the search at the scene of arrest and its consummation in California 10 days later, that separation was rendered necessary, or at least highly convenient, by practical considerations of significant scope and importance. The F.B.I. agents who arrested defendant on a fugitive warrant and conducted the initial search of the automobile at the scene had no responsibility to proceed with an investigation. That responsibility, as well as the present ability to discharge it, lay with California authorities, who were immediately upon arrest summoned by the arresting agents. Upon their arrival in New Orleans, the California officers reasonably concluded that the most efficacious method of conducting the necessary scientific examination of the seized automobile was to transport it to California, where their scientific facilities were located and where physical clues found at the scene could conveniently be compared to portions of the automobile and items discovered therein.[13]

---

brief search for weapons at the scene. There was evidence that, before any detailed examination of the vehicle was undertaken at the precinct station, an officer went to the vehicle and commenced to roll up the windows in order to protect it from rain and that in the course of this operation he observed incriminating evidence in plain sight. On appeal a three-judge panel of the Court of Appeals reversed on the ground that the discovery of evidence resulted from a search in violation of *Preston*; in so doing it expressly rejected the contention of the Attorney General that the search was lawful as a proper examination of evidence properly seized. Upon rehearing *en banc* the court refused to consider this contention and held that the operation which had disclosed the incriminating evidence was not a search but a measure designed to protect property in police custody, and that evidence disclosed as a result thereof was therefore admissible. (*Harris* v. *United States, supra,* 370 F.2d 477.) The judge who had written the opinion of the panel dissented, along with one other and set forth the panel opinion as an appendix. (370 F.2d at pp. 479-483.) Certiorari was granted, and the Supreme Court adopted the rationale of the *en banc* Court of Appeals and affirmed. (390 U.S. 234.)

[13]As indicated in footnote 4, *ante*, and accompanying text, the criminalist's examination extended not only to portions of the automobile

They thereupon took elaborate precautions to insure that the vehicle would not be tampered with during its trip to California, and the examination proceeded promptly when it arrived. In light of the combination of unusual factors here involved it must be concluded that the scientific examination in California was a proper continuation of the search undertaken incidental to defendant's arrest .(See *People* v. *Chapman, supra,* 261 Cal.App.2d 149, 167-171.)

For the foregoing reasons we have concluded that the judgment insofar as it relates to guilt must be affirmed. However, under the compulsion of *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770], we must reverse the judgment insofar as it relates to penalty because certain prospective jurors were excused for cause in violation of the standards set forth by the United States Supreme Court in that case.

In the instant case 14 veniremen were excused for cause because of their conscientious opinions relative to the death penalty. (See Pen. Code, § 1074, subd. 8; *People* v. *Gonzales* (1967) 66 Cal.2d 482, 497 [58 Cal.Rptr. 361, 426 P.2d 929]; *People* v. *Riser* (1956) 47 Cal.2d 566, 575-576 [305 P.2d 1].) Of these, several were excused when, after manifesting opposition to capital punishment in general language, they responded in the affirmative to the court's inquiry whether such opposition would prevent them from rendering the verdict of death "in a proper case." We set forth in the footnote illustrative portions of the *voir dire.*[14]

---

itself but also to items of clothing found inside. Certain of the articles of clothing, notably a shirt and a man's jacket, were introduced into evidence over defendant's objection.

[14]*Mrs. Apodaca (8th venireman, second day).*

"Q. . . . Do you have some question with regard to the guilt or innocence of the defendant? A. Well, I don't believe in capital punishment. Q. You have a mental conviction that would prevent you from imposing the death penalty in a proper case? A. Yes.

"THE COURT: Do either counsel wish any interrogation at all of this prospective juror? . . . BY MR. DRIVON [the prosecutor]: Q. Mrs.—is it Apodaca? A. Yes. Q. You don't feel you have such a strong feeling about capital punishment that you don't believe you could participate in any verdict that might result in bringing in that verdict? A. Well, I— Q. Not capital punishment? A. Yes. Q. This is a strong— A. (Interrupting) I don't believe in capital punishment. Q. You wouldn't want to sit? A. In that kind of a case.

"MR. DRIVON: Your Honor, I would impose a challenge for cause. . . ."

*Mrs. Moore (24th venireman, second day).*

"Q. And do you have any opinion or conclusion concerning the guilt or innocence of this defendant as a result of reading, looking at or discussing this case? A. No. This is the only thing, your Honor, and that is

In *Witherspoon* the United States Supreme Court held that a "sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." (391 U.S. at p. 522 [20 L.Ed. 2d at p. 784].) It was there emphasized, however, that this ban did not extend to "a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made it unmistakably clear . . . that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them. . . ." (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].) ▮ It is in light of these basic standards that our constitutional task must be carried out. That task, translated into the terms of California practice, requires that we address our-

---

capital punishment, that's all—I don't believe in that. Q. You feel you could not impose capital punishment in a proper case? A. No. . . .

"By Mr. Drivon [the prosecutor]: Q. Mrs. Moore, is this an opinion—feeling that you have very, very well fixed in your mind and your heart? A. Yes, sir. Q. And you are very convinced that you couldn't do that? A. Yes. [Excused for cause.]".

*Mr. Ivy (26th venireman, second day).*

"Q. Do you have any conscientious objection to the imposition of the death penalty in a proper case? A. I do more or less. I don't know whether I want to be involved in a situation where the death penalty would be imposed. Q. Well, the Court doesn't expect you to do any violence to your own personal beliefs, Mr. Ivy. I must inquire with respect to your feelings concerning the death penalty: Do you have any conscientious objection to the imposition of the death penalty in a proper case? A. I'll state it this way, your Honor: When I was a child I always didn't like the idea of a man—even the law, you know—having to do with the death penalty, so I couldn't render a decision in this case—I don't think so. Q. Well, we respect you for your opinion Mr. Ivy.

The Court: Counsel desire to interrogate further?

"By Mr. Drivon: Q. You don't feel that you could participate in anything like that? You have a pretty strong fixed feeling in that respect, Mr. Ivy? A. Yes, as far as the death penalty is concerned. Q. Thank you very much for your honesty and forthrightness.

"Mr. Drivon: I will impose the challenge for cause for the reasons stated."

*Mrs. Blim (41st venireman, second day).*

"Q. If the same questions were addressed to you would your answers be substantially the same? A. Yes, excepting in the case of capital punishment. Q. What's that? A. I do not believe in the death penalty. Q. You have a moral conviction which would make it impossible for you to render the death penalty verdict in a proper case? A. Yes, sir.

"The Court: Mr. Drivon.

"Mr. Drivon: Just one question:

"By Mr. Drivon: Q. Is this very firm and fixed in your mind and your heart, Mrs. Blim? A. Yes. Q. You couldn't participate in it? A. No, I don't feel that I could. Q. Conscientiously you couldn't? A. No.

"Mr. Drivon: We'd interpose the challenge, . . ."

selves in each case to this question: Has each juror excused for cause under Penal Code section 1074, subdivision 8, made it "unmistakably clear" that his conscientious scruples relative to the death penalty render him incapable of exercising that discretion contemplated by sections 190 and 190.1 because he would "*automatically*" vote against the death penalty regardless of the evidence presented?

The adequacy of questions such as those here involved (i.e., questions asking whether the venireman's scruples would preclude him from voting for the death penalty "in a proper case")[15] to bring about the required showing was specifically questioned in *Witherspoon*. ". . . [I]t cannot be assumed that a juror who describes himself as having 'conscientious or religious scruples' against the infliction of the death penalty or against its infliction 'in a proper case' (see *People* v. *Bandhauer*, 66 Cal.2d 524, 531 [58 Cal.Rptr. 332, 426 P.2d 900, 905]) thereby affirms that he could never vote in favor of it or that he would not consider doing so in the case before him." (391 U.S. at pp. 515-516, fn. 9 [20 L.Ed.2d at p. 781].)

The possibilities of ambiguity and confusion latent within the bare phrase "in a proper case" are manifest.[16] Thus, in the absence of additional language which might explain its content or nullify its effect, the phrase might easily suggest to a venireman that the law classes certain kinds of cases as "proper" for the infliction of the death penalty and that, if the defendant is found guilty of a crime of this class, the jury will be *required* to impose the death penalty. A venireman under this impression, conceiving that his oath as a juror might require him to concur in a verdict of death in a case which the law deemed "proper" for that penalty—but which he himself did not deem "proper" therefor—might well reply in the affirmative to the court's question as to whether his scruples would prevent his concurrence in a verdict of

[15]The phrase "in a proper case" has been utilized in this state for many years in connection with challenges for cause under Penal Code section 1074, subdivision 8. It appears within recommended forms of jury inquiry in capital cases. (See, e.g., Conference of California Judges, Manual of Procedures for the Superior Court of the State of California (1966) pp. 56-57.)

[16]"The critical question, of course, is not how the phrases employed in this area have been construed by courts and commentators. What matters is how they might be understood—or misunderstood—by prospective jurors." (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 516, fn. 9 [20 L.Ed.2d 776, 781].)

death "in a proper case."[17] That same venireman, on the other hand, if he were correctly made to understand that "What constitutes a proper case is . . . for the juror to decide" (*People* v. *Bandhauer* (1967) 66 Cal.2d 524, 531 [58 Cal.Rptr. 332, 426 P.2d 900]), might well be able and willing to set aside his conscientious scruples and exercise the discretion contemplated by sections 190 and 190.1 of the Penal Code.

In the light of these dangers of confusion and misapprehension it cannot reasonably be said that a venireman, merely by affirming that he harbors conscientious scruples which would prevent his concurrence in a verdict of death "in a proper case," thereby (i.e., by means of that bare affirmation) "ma[kes] unmistakably clear . . . that [he] would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before [him]. . . ." (391 U.S. at p. 522, fn. 21 [20 L.Ed.2d at p. 785].)

However, as we have suggested in a recent case, we cannot realistically consider a venireman's response to a question on *voir dire* examination as an hermetically sealed unit wholly unrelated to its context. "Our task [i.e., that of determining whether each venireman excused for cause has made it 'unmistakably clear' that he would automatically vote against the death penalty regardless of the evidence presented] requires us to assess the responses of the venireman in the full context of that portion of the court and counsels' *voir dire* examination of the entire panel conducted during the time said venireman was present in the courtroom and until the time he or she was excused for cause. To ascertain what the juror meant by what he said, we must consider not merely the words of his answers but also the words of the questions he was asked and additionally all of the circumstances in which the colloquy took place." (*People* v. *Varnum* (1969) *Ante,* pp. 480, 492-493 [75 Cal.Rptr. 161, 450 P.2d 553].)

In *Varnum* the venireman whose excuse for cause was challenged by defendant had answered in the affirmative to a question couched in "proper case" language. The particular question did not undertake to explain the correct meaning of

---

. [17]An attitude such as that described is not sufficient to justify excuse for cause. "Just as veniremen cannot be excluded for cause on the ground that they hold such views, so too they cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment." (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 522, fn. 21 [20 L.Ed.2d 776, 785].)

that language and we observed that, if we were to consider the question and answer out of its context, "we could not assume that [the venireman] thereby affirmed 'that [she] could never vote in favor of [the death penalty] or that [she] would not consider doing so in the case before [her].' (*Witherspoon* v. *Illinois, supra,* 391 U.S. 510, 515-516, fn. 9 [20 L.Ed.2d 776, 781].)'' (*Ante,* at p. 394.) However, when we examined the question and answer "in the full context and setting of the *voir dire* examination conducted up until the time [the venireman] was excused" (*Ante,* at p. 394), we determined that the venireman clearly understood that "a proper case" was one which she as a juror would determine to be such in the exercise of the discretion contemplated by sections 190 and 190.1 of the Penal Code.

In making this determination we had reference to the fact that during the one and one-half days of *voir dire* proceedings which had taken place prior to the examination of the venireman in question the court and counsel had on numerous occasions made clear to the assembled panel that the jury would in its sole discretion decide whether the case before it was a "proper case" for the infliction of the death penalty. Assuming as we must in the absence of a contrary showing that the panel had assimilated that essential information directed to it, we thus concluded that the venireman, by answering in the affirmative the question put to her, thereby made it "unmistakably clear" that she would automatically vote against the death penalty regardless of the evidence presented, and that therefore she was properly excused for cause under the standards set forth in *Witherspoon.*

▉ In the instant case, as in *Varnum,* we have attempted to evaluate the examination of the challenged veniremen "in the full context and setting of the *voir dire* examination conducted up until the time [the venireman] was excused." (*Ante,* at p. 394.) This effort has revealed, first, that the court at no time during the entire jury selection proceedings correctly explained to the panel or any member thereof that a "proper case" for the infliction of the death penalty was one which the jury in its sole discretion determined to be such. Thus, in its introductory remarks to the panel, which we set forth in relevant part in the footnote,[18] the court several

---

[18]"As I have indicated, a conviction in the first phase may call for a determination by the jury in the second phase of whether death or life imprisonment is an appropriate penalty.

"It will, therefore, be necessary during your present examination as prospective jurors to question you as to what, if any conviction or feel-

times mentioned a "proper case" without undertaking to explain the meaning of the phrase. Similarly, in its examination of veniremen, the court's efforts to clarify and emphasize the phrase amounted to little more than a redefinition in the same terms.

Secondly, it appears that some of the court's efforts to convey the meaning of "proper case" resulted in comments which could easily have been interpreted to suggest a wholly erroneous impression. Thus, one of the court's comments might reasonably bear the interpretation that a "proper case" for the infliction of the death penalty is one in which the defendant has been found "guilty of the crimes charged."[19] Another might easily have suggested that the law required a death verdict "under certain conditions."[20]

Finally, the examination of veniremen by counsel, although containing several instances wherein the correct meaning of "proper case" was *suggested*,[21] is also fraught with statements which could only have produced confusion and misapprehension in the panel.[22]

---

ings you may now entertain concerning your ability to conscientiously consider and, if proper, to impose the penalty of death on this defendant in a proper case.

"To that end you may be asked on your present examination if you have any feeling that would make it impossible for you to conscientiously impose the sentence of death in a proper case, and similarly when first considering the guilt or innocence of the defendant would the knowledge that in the event you were to find the defendant guilty of murder in the first phase and hence there was the possibility of such penalty of death being imposed, interfere with your rendering a vote of guilty in the first phase; or, stated another way, would the fact that a death penalty might be imposed as a result thereof interfere with your ability to render a verdict of guilty in the first phase of this matter?"

[19] "Q. In a proper case, and when I use the word 'proper' I mean that it has been established beyond a reasonable doubt and to a moral certainty that the defendant has been—is guilty of the crimes charged and it is a proper case in which the death penalty could be imposed, after you have heard all the evidence and sitting in the second phase of the trial, would you have any problem about invoking the death penalty if it were a proper case?"

[20] "Q. In the alternative, the law in some cases provides that the death penalty should be imposed under certain conditions; you feel if all those conditions were met you still could not impose the death penalty?"

[21] "Q. And in the event that verdict was returned and you were called upon to sit in judgment as to whether this is a proper case for the application of the death penalty and you were convinced that this was a proper case, you wouldn't hesitate in assessing the death penalty?"

[22] "Q. In that event you were then called upon to decide what penalty should be applied here, and under the instructions from his Honor as to what would be a proper case and what you would consider to be a proper case for the death penalty, if you decide in your own mind it wasn't a proper case for the death penalty, you wouldn't hesitate in bringing in life imprisonment?"

It is clear from the foregoing that here, unlike in *Varnum*, it cannot reasonably be said that veniremen who answered in the affirmative to a question couched in "proper case" language thereby made it "unmistakably clear" that their scruples against capital punishment rendered them incapable of exercising the sole discretion contemplated by sections 190 and 190.1 of the Penal Code because they would *automatically* vote against the imposition of the death penalty regardless of the evidence.[23] The judgment must therefore be reversed as it relates to penalty.

■ Of defendant's remaining contentions relating to the penalty phase only one need here be mentioned for the guidance of the court upon retrial of that phase.[24] It is urged that certain testimony given by the victim of a prior offense was erroneously admitted because its probative value was outweighed by its prejudicial effect. It appears that the prosecution, after offering into evidence at the penalty phase all testimony and exhibits received during the guilt phase, placed in evidence a certified copy of the judgment in a prior conviction of defendant for robbery and assault with a deadly weapon. Upon admission of this document the prosecution then proceeded to call as a witness the victim of these other offenses who testified that on January 4, 1951, he was tending the bar of a tavern in which he was part owner; that defendant and another man, having made two brief visits to the tavern earlier in the evening, returned at 11:30 p.m. and announced "This is a stick up!"; that immediately after this announcement defendant, who was armed with a .32 caliber pistol, fired a shot at the witness which missed; that the witness, concluding that the gun was loaded with blank cartridges, approached defendant and demanded that he give up

---

[23]Some indication of the panel's understanding of the task required of penalty jurors is provided by the *voir dire* examination of Mrs. Lacey, who was ultimately excused by peremptory challenge. Mrs. Lacey, the wife of a local attorney, was the *58th* venireman to be examined. In response to the court's question whether she had "any moral conviction that would prevent [her] from imposing the death penalty in a proper case" she relied that "in a proper case [she] would be very careful," and that she did not like the death penalty but "could use it if necessary." Then, while she was being examined by the district attorney, she made the following inquiry: "Well, there's one gap in my mind, I'm not sure where you invoke the death penalty and when you don't invoke it. I don't know whether there's a law that you go by for this or what the difference is between life imprisonment and the death penalty. I have never had that before."

[24]Defendant's contention that the death penalty is unconstitutional must be rejected for the reasons recently stated by us in *In re Anderson* (1968) 69 Cal.2d 613 [73 Cal.Rptr. 21, 447 P.2d 117].

the gun; that defendant then said "Take one more step and I'll let you have it" and fired at the witness, striking him in the abdomen; that the bullet passed through his kidney and lodged in his back, causing partial paralysis; that defendant and his companion then lined up the 16 to 18 persons then in the tavern and relieved them of their billfolds and valuables; that defendant then approached the witness, who remained on the floor in a state of partial paralysis and sought to take his billfold; that the witness, intending to disarm defendant, grabbed his hand but defendant then placed the pistol at his temple and said "Give me your—give me the thing you s.o.b. or I'll blow your brains out"; that the witness then relinquished his billfold and the robbers departed; and that the witness was hospitalized for nine days as a result of the wound and subsequently was required to undergo "additional correctional surgery."

The transcript of proceedings at the penalty phase does not reveal that defendant objected to the subject testimony and thereby called upon the court to weigh its probative value against its prejudicial effect. (Cf. *People* v. *Durham, supra, Ante,* pp. 171, 195; see *People* v. *Love* (1960) 53 Cal.2d 843, 856 [3 Cal.Rptr. 665, 350 P.2d 705].) Defendant asserts, however, that such an objection was made off the record in chambers prior to the presentation of such testimony and offers to file a stipulation signed by the prosecutor and the court to that effect. We deem it unnecessary to consider the acceptability of such a stipulation in the premises because we have concluded that, even if it be assumed that defendant made an appropriate objection, the probative value of the subject testimony was sufficient to outweigh its prejudicial effect and thus render it admissible. The jury was entitled to know, in the course of its inquiry into "defendant's background and history" (Pen. Code, § 190.1) that defendant in the course of a prior offense[25] had shot a human being wholly without significant provocation and, as the victim lay in a state of partial paralysis on the floor, threatened to "blow [his] brains out" if his billfold were not produced. (Cf. *People* v. *Bentley* (1962) 58 Cal.2d 458 [24 Cal.Rptr. 685, 374 P.2d 645].) These matters, so relevant to the jury's assessment of defendant's character, could not be made to appear

[25]Here, as in *People* v. *Bentley* (1962) 58 Cal.2d 458 [24 Cal.Rptr. 685, 374 P.2d 645], the evidence in question did not relate to the circumstances of the charged crimes (cf. *People* v. *Love, supra,* 53 Cal.2d 843) and was in no sense cumulative of facts already in evidence. (See also *People* v. *Durham, supra, ante,* pp. 171, 195.)

from a certified copy of the prior judgment, and we do not consider that the method by which they were presented resulted in undue prejudicial effect. The testimony was properly admitted.

The judgment is reversed insofar as it relates to penalty; in all other respects the judgment is affirmed.

Traynor, C. J., Tobriner, J., Burke, J., and Schauer, J.,* concurred.

McCOMB, J.—I would affirm the judgment in its entirety.

PETERS, J.—I concur in the affirmance of the judgment relating to guilt. I do so reluctantly because I think that under the rules laid down in *Preston* v. *United States*, 376 U.S. 364 [11 L.Ed.2d 777, 84 S.Ct. 881], the search and examination of the automobile were illegal. But as I have already pointed out in my concurring opinion in *People* v. *Webb*, 66 Cal.2d 107, 128 [56 Cal.Rptr. 902, 424 P.2d 342], the *Preston* case has, in effect, been overruled by the majority rule adopted in *Cooper* v. *California*, 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788]. Solely by compulsion of the rule laid down in that case, I agree that the rule of *Preston* is not applicable.

I also concur in that portion of the majority opinion reversing the judgment insofar as the penalty is concerned.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.