**C. S. BOX, Appellant,**

**v.**

**The STATE of Oklahoma, Appellee.**

**No. A–16717.**

Court of Criminal Appeals of Oklahoma.

Feb. 6, 1973.

Rehearing Denied March 8, 1973.

Red Ivy, Chickasha, for appellant.

Larry Derryberry, Atty. Gen., Nathan J. Gigger, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Presiding Judge:

The appellant, C. S. Box, hereinafter referred to as defendant, was charged, tried and convicted in the District Court of Grady County for the offense of Larceny of Domestic Animals; his punishment was fixed at three (3) years imprisonment, and from that judgment and sentence, a timely appeal has been perfected to this Court.

At the trial, the testimony of Mr. Earl Campbell revealed that approximately two miles south of Tuttle, on Highway 37, Campbell owned property on which he raised cattle. At approximately 5:00 a. m. on March 23, 1970, a neighbor phoned Campbell and informed him that some of his cattle were on the highway near this property. Immediately, he drove to the property and moved those cattle back to pasture. On the following morning, several cows were bawling for their calves. Campbell checked his records and found three Black Angus bull calves and three Black Angus heifer calves were missing. Further he stated the missing calves were more particularly described to be ranging in weight from 150 to 200 pounds, one was spotted and five were black, and each calf was numbered by an ear tag with a number corresponding to a number assigned to its parent.

On Thursday of the week following the disappearance of these calves, Campbell ob-

served the three bull calves at the Carl Heckes farm at El Reno, Oklahoma. He identified them, picking them from a herd of thirty to forty cattle. The three heifer calves were found on the Arthur Mueggenburg farm at Okarche, Oklahoma. He again made his identification from a herd of twenty cattle on the lot. Campbell further stated that in both instances his identification was made on the basis of color, personal knowledge, and small holes in the calves' ears left by the removal of the ear tags he used in numbering his calves for identification. After the calves were returned and unloaded on the Campbell property, the calves found and were accepted by their mothers. State's Exhibits One through Nine, photographs of the calves, were introduced to show identification of the calves with their mothers. Campbell testified that he had never sold any of his cattle at the Yukon sale nor had he given anyone permission to take them.

Robert Gene Adams testified that at approximately 12:00 midnight on the 22nd of March 1970, he met the defendant in a restaurant at the Skelly service station restaurant on the H. E. Bailey Turnpike. The defendant asked him if he wanted to make some money and he replied that he did. At approximately 12:30 a. m. they left in the defendant's pickup, drove to Tuttle, and then drove approximately one and one-half miles south of Tuttle on Highway 37. The defendant opened the gate and they drove onto the property to a barn where the cattle were penned. The defendant made two attempts to back the pickup to the cattle pen. The first attempt resulted in the defendant backing into a corral post. Together they roped six 150- to 250-pound calves, loaded them into the pickup and transported them to the defendant's home. On the following Tuesday, March 24, 1970, Adams returned to the defendant's house. He observed the defendant remove the ear tags from the calves, helped him load the calves into the pickup, and accompanied the defendant while he transported them to the Yukon sale. At the sale, Adams stated that three of the

calves were sold for Seventy-five Dollars ($75.00) each and three were sold for Ninety Dollars ($90.00) each. Further, Adams testified that he observed the defendant receive State's Exhibit Ten, the check in payment for the calves. Adams stated he received One Hundred Forty-seven Dollars ($147.00) for his part of the transaction after State's Exhibit Ten was cashed at the shopping center at S.W. 74th and Pennsylvania, Oklahoma City, Oklahoma.

Dannie Hill testified that he was the lessor of the property on which the defendant lived. On the morning of March 22, 1970, at approximately 5:30 to 6:00 a. m., he observed five 250- to 300-pound calves in a pen on the property the defendant leased from him.

Carl Heckes and Arthur Mueggenburg each testified that they purchased three calves at the Yukon Livestock Sale on March 24, 1970. Each testified that he was present when Campbell came to his property and identified the calves as the calves that had been stolen from him on the 22nd.

Glen Cornwell testified that he conducted a livestock auction sale at Yukon, Oklahoma. He identified, as a business record, State's Exhibit No. 13, a bill of sale for three bull and three heifer calves. This sales slip showed the defendant as the seller of three Black Angus bulls and three Black Angus heifers. It reflected the total sale price of Five Hundred Nineteen Dollars ($519.00) with Carl Heckes and Arthur Mueggenburg as the respective purchasers. Further, he identified State's Exhibit Ten as the check issued to Box by the livestock auction.

Buford Brown, undersheriff for Grady County, stated he investigated the loss of the Campbell calves. He testified he removed a paint sample from a creosote post, State's Exhibit No. 11, near a loading area where the calves were found missing. Further, he stated he removed paint samples from the defendant's pickup bumper, State's Exhibit No. 12. He stated he la-

beled and packaged the samples and Deputy Ron Taylor transported them to the Crime Bureau.

John McAuliff testified that he made paint comparisons of State's Exhibits 11 and 12 and found the paint from the posts matched identically those samples removed from the defendant's bumper.

Thereafter, the State rested.

The defendant testified that he was staying with his mother in Oklahoma City on Sunday, March 22, 1970. He arrived at his mother's house at approximately 7:00 p.m. on that evening. His testimony generally revealed that on the evening of the 22nd, from 7:00 p.m. to 11:00 p.m. he was either at his mother's home, helping a friend move a truck from a ditch, or visiting with his cousin. He stated that he arrived back at his mother's home at 11:30 p.m. and stayed there until Tuesday morning, March 24. On Tuesday, he drove to his house in Tuttle, Oklahoma, where he met Adams. After he arrived at the house, he observed Adams feed calves which Adams had penned on his property. Adams asked the defendant if he would purchase these calves from him. The defendant replied that he could not, however, he would help him transport them to a sale if Adams would help him move his furniture. While they were transporting the calves to the Yukon sale, a man stopped them and asked Adams if he would sell two of the calves. Adams refused to sell them separately. The defendant talked with this person and found that the calves were worth approximately $400.00 to $450.00. The defendant later told Adams he would guarantee him $400 for the calves if Adams would allow him to sell them with him taking the difference between the sale price and $400.00. Purportedly, Adams agreed to this arrangement. The defendant testified that after they made the sale he gave Adams $400 and he kept the balance as per their agreement.

Galen Moore testified that on the 24th of March, he observed the defendant driving his pickup which was transporting six calves. He stopped him to purchase two calves. In response to his questions, Adams stated that he would not split them. He wanted to sell them together.

Mrs. Doris Hall testified that the defendant arrived at her home on the 22nd of March 1970, stayed a short period of time, left, returned and was present in their home at 10:30 p.m. when she retired for the evening.

Paul Hall, the defendant's cousin, testified the defendant left his home at approximately 11:30 that evening.

Stella Box, the defendant's mother, testified that on March 22, 1970 the defendant was in and out of her home during that evening and that at approximately 11:30 p.m. he arrived at her home and remained there through Monday, leaving early on the morning of March 24. The defendant rested.

In the defendant's first proposition the contention is asserted that paint scrapings not taken contemporaneously with the arrest of the defendant and taken from the bumper of the defendant's pickup at a place and time remote from the arrest are the product of an unlawful search and seizure. The facts from the pretrial motion to suppress revealed that the defendant was arrested on April 3, 1970 near his home at Tuttle, Oklahoma. Buford Brown and Doc Baker, deputy sheriffs for Grady County, testified that they had an arrest warrant for the defendant. They observed the defendant in his pickup driving on a county road near his house. They pursued him, overtook him, placed him under arrest and advised him of his constitutional rights. The deputies aided the defendant in unloading livestock from the pickup and, according to their testimony, controverted by the defendant, the defendant gave Deputy Baker consent to drive the pickup to the court house. After the defendant was jailed, Brown removed paint scrapings from the bumper of the pickup which was parked on a public street near the court house.

In the case of Cooper v. California, 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967), discussed in Gaston v. State, Okl. Cr., 457 P.2d 807 (1969), the defendant was convicted for the offense of Sale of Heroin. The conviction rested in part on the introduction into evidence of a small piece of a brown paper sack seized by police from the glove compartment of an automobile which the police, upon the petitioner's arrest, had impounded and were holding in a garage. The search occurred one week after the arrest of the defendant and was conducted without a warrant. The officers in *Cooper, supra,* seized the petitioner's car because they were required to do so by law. Upon impounding it, they were required to keep it until forfeiture proceedings were concluded, which in this case was approximately four months. The Court determined that the vehicle was seized because of the crime for which the defendant was arrested. The Court held that it was unreasonable to hold that the police, having to retain the car in their custody for such a length of time, had no right, even for their own protection, to search it. It was held to be no answer that the police could have obtained a search warrant; the relevant test is not whether it is reasonable to obtain a warrant but whether the search was reasonable.

In the case of People v. Teale, (1969) 70 Cal.2d 497, 75 Cal.Rptr. 172, 450 P.2d 564, the Court recited the rule in *Cooper, supra,* in a case in which the defendant was charged with Murder with an automobile involved in the commission of the offense. At the time of the arrest of the defendant, two objects were seized, a .32-caliber automatic pistol and the automobile used. The seizure of both objects was contemporaneous with the arrest. A scientific examination of the defendant's vehicle was conducted in a point in time following the arrest. A chemist's testimony was admitted at trial explaining the evidence from the examination. The Court held that, since both the gun and the automobile were seized contemporaneously with the arrest,

incidental to the arrest, and could have been introduced at trial as evidence, both objects were plainly within the realm of police investigation and the defendant could not reasonably contend that such testing and examining was in derogation of his Fourth Amendment rights. In *Teale, supra,* the Court in construing the implications in an earlier case, People v. Webb, (1967) 66 Cal.2d 107, 56 Cal.Rptr. 902, 424 P.2d 342, the Court definitively stated that when the police lawfully seize a car which is itself evidence of a crime rather than merely a container of incriminating articles, they may postpone searching it until arrival at a time and place in which the examination can be performed in accordance with sound scientific procedures. In further clarification, the Court made an analogy with a situation where a person suspected of a homicide is found possessing a gun and the fact that a search warrant is unnecessary to enable the police to test that gun by firing bullets from it to determine if the gun was the one used in a killing. The general rule, as stated by the Court, in *Teale, supra,* reads as follows:

" * * * When officers, incidental to a lawful arrest, seize an automobile or other object in the reasonable belief that such object *is itself evidence* [Footnote omitted] of the commission of the crime for which such arrest is made, any subsequent examination of said object undertaken for the purpose of determining its evidentiary value does not constitute a 'search' within the meaning of the Fourth Amendment. * * * "

In State v. Lewis, 22 Ohio St.2d 125, 258 N.E.2d 445 (1970), the Court dealt with a situation in which evidence was introduced to the effect that paint samples taken from the exterior of the defendant's car after it was seized were similar to paint samples found on the car of the deceased at the scene of the crime. The Court, after discussing the above general rule, held these samples admissible and not the product of an unlawful search and seizure, even though the examination was conducted at a time and place remote to the time and

place of the arrest of the owner and seizure of the automobile.

■ In the instant case, the pickup was seized contemporaneously with the arrest of the defendant. The evidence revealed that this vehicle was used to transport the calves from the Campbell property and to the Yukon Livestock Sale. Photographs of the pickup, State's Exhibits 11 and 12, were introduced at trial making the pickup unquestionably a part of the evidence in this prosecution. Based upon the authority herein recited we find that taking of paint samples in this case did not constitute a search under the Fourth Amendment to the constitution. The seizure of the pickup was proper as it was contemporaneous with, and incidental to, the arrest and the paint samples were the product of a lawful scientific inspection of the evidence as the taking of the sample was the first step in the scientific investigation. Therefore, no warrant was necessary as we find this case clearly distinguishable from Preston v. United States, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964), the authority submitted by the defense.

■ In the defendant's second proposition, he submits that the form of the prosecutor's questions on cross-examination of some of the defendant's witnesses was prejudicial. We have carefully reviewed the record and find that the objections to the questions referred to by the defendant were sustained by the trial court. Further, we find that the questions were not manifestly prejudicial and consequently do not constitute fundamental error. Since counsel has not submitted authority in support of this contention and it is necessary for counsel for the defense not only to assert error, but to support his contentions by both argument and the citations of authorities. Where this is not done, and it is apparent that the defendant has been deprived of no fundamental rights, this Court will not search the books for authorities to support the mere assertion that the trial

court had erred. Sandefur v. State, Okl. Cr., 461 P.2d 954 (1969). We, therefore, find this assignment to be without merit.

■ The second assignment of error in this proposition states that since the paint samples were the product of an unlawful search and seizure, there is not sufficient evidence to corroborate the accomplice's testimony and consequently the evidence is insufficient. As we stated previously, the samples were lawfully taken. They meet the requirement of slight corroboration, are legally sufficient, and support the jury's verdict.

■ Counsel assigns as error in his third proposition the closing arguments of the prosecutor. Counsel admits in his brief that each error taken separately in and of itself is not of a magnitude to require reversal. He states the arguments taken as a whole are prejudicial. We find counsel's contention correct in that the portions of the argument to which reference is made are not manifestly prejudicial. We note further that the defendant received the minimum sentence for this offense. This indicates that the punishment administered by the jury was not founded upon prejudice. Finally, we note that at the time counsel propounded his objections, he did not request the court to admonish the jury not to consider the comment. We have repeatedly held that objections must be made to the improper argument during the trial, and the defendant must go further and move the objectionable argument be stricken from the jury's consideration, unless the remarks were such they could not be cured by their withdrawal from the jury. Watts v. State, Okl.Cr., 487 P.2d 981 (1971). Counsel waived his objection to this argument as we do not find the arguments to be fundamentally erroneous. The judgment and sentence is, accordingly, affirmed.

BUSSEY, and BRETT, JJ., concur.