[Crim. No. 5280. Third Dist. Dec. 8, 1969.]

THE PEOPLE, Plaintiff and Respondent, v.
TIM DE PRIEST, Defendant and Appellant.

**COUNSEL**

James D. Ginotti, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Joel S. Primes, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**REGAN, J.**—Defendant was charged by information with the crimes of a violation of section 211, Penal Code (robbery), and in a second count of violation of section 187, Penal Code (murder).

After a trial by jury, defendant was convicted of robbery in the second degree (Pen. Code, §§ 211, 211a) and manslaughter (Pen. Code, § 192), which is a lesser included offense of the charge of murder as set forth in count two of the information. He appeals from the judgment of conviction.[1]

On January 12, 1968, a Lodi city policeman, Officer Conner, responding to a radio call, found the body of the deceased Mrs. Quinn on the floor of Quinn's Bar. The front door glass had been broken; Mrs.

---

[1] The judgment provides, in part: "Imposition of sentence stayed on Count II, to-wit: MANSLAUGHTER, a felony, a lesser and included offense of the charge of Murder, pending the completion of sentence under Count I or pending a reversal on said Count I in the event of an appeal."

Quinn's left eye was puffed, and a small trickle of blood went down to her ear; and a handkerchief and brassiere were found lying at the top of the victim's head on the right side. There were three cash registers in Quinn's Bar, two on the front bar and one on the rear bar. Conner checked all three registers and found two one-dollar bills; 90 cents in change was found on the bar. Officer Conner in his report noted "weapon, force or means used" as "unknown."

Harry J. Schneider, M.D., a pathologist, testified that he performed an autopsy on the body of the deceased on January 12, 1968, finding: "On external examination of the body there were numerous bruises, contusions of the upper portion of the body, of the face, arms and chest." Further, "the left eye area was swollen and ecchymatic, which is a hemorrhage beneath the skin which produces a black eye if it remains there long enough. There was some blood in the right ear with a small tear in the canal; there was a contusion in the mouth, small laceration." The doctor continued, "I was able to demonstrate when I removed the calvarium in the brain that there was a penetration through and to the fatty tissue surrounding the eye." He testified that the injury to the eye was "produced by something that had some relative sharpness and it was my impression that a fingernail could possibly have caused that."

Dr. Schneider in his analysis of the cause of death stated that "the most likely cause was a method of obstruction of the air entering and leaving the lungs," and concluded: "With the findings of the evidence on her face, the trauma and the lack of clotting of blood and the partial collapse of the lungs, they were all consistent with asphyxial death which I thought probably was caused by an obstruction over the nose and mouth."

Louis Candelo, a friend of defendant for appoximately nine months, testified that on January 11, he, defendant, and one Larry Wood started a drinking spree at appoximately 1:30 p.m. in the town of Galt. After considerable bar hopping, during which time quite a few beers were drunk by the trio, they entered Lodi at approximately 11 p.m. and parked across from Quinn's Bar. When they entered the bar, they discovered Mrs. Quinn on the customer's side asleep. They hollered and whistled to awaken her. After about an hour, the trio left Quinn's Bar and went to the Fifteen Club, another bar next door to Quinn's.

While at the Fifteen Club, Candelo apparently made the remark that anybody could have walked in and robbed her.

The three returned to Quinn's where defendant borrowed a dollar from Larry Wood. Candelo and Wood then left Quinn's and returned to the Fifteen Club. Later they left to retrieve a jacket from the car. They looked

through the window of Quinn's Bar and saw defendant with a glass of beer while Mrs. Quinn was behind the bar. Candelo and Wood returned to the Fifteen Club and remained there until it closed at 2 a.m. They tried the door at Quinn's Bar to see if defendant was ready to leave. The door was locked but the lights were on. Candelo and Wood then crossed the street and sat in defendant's car to wait for him.

While waiting for defendant, a taxicab drove up and stopped in front of Quinn's. After the cab had left, Candelo saw defendant standing over the cash register with his elbows straight up. Shortly thereafter, Candelo heard "glass break, looked up and Tim [defendant] was kicking the glass out of the front door . . . of Quinn's." Defendant ran out and crossed a street with Candelo and Wood in pursuit. Defendant was carrying a bottle of tequila in his hand. When Candelo caught up with defendant, defendant threw him the car keys and told Candelo to go get the car and pick him up. Candelo went back, got the car and picked up defendant and Wood.

Defendant's hand was bleeding and he wanted to wash it off, so Candelo drove to a nearby Shell station. While in the car, defendant told Candelo and Wood that he "snuffed that old bitch in the bar." After defendant washed his hand and returned to the car, Wood indicated that he wanted to go home. During the ride back, defendant stated he "choked her with his hand and after his hand got tired he put his knee on her and stopped [her] breathing." Defendant further told Candelo and Wood he had sexual relations with Mrs. Quinn, and she told him that he was "not much of a man." Defendant, according to Candelo, then began choking the victim. Defendant also told his two companions that he opened the till with his elbows.

As they were driving around, defendant started pulling money out of his pockets. Defendant then started counting the money, which was in denominations of ones, fives and tens. After taking Larry Wood home, defendant and Candelo drove to defendant's house, where they met another friend, Mike Howard. These three then drove around for awhile drinking beer. Candelo testified that defendant told Howard that he, defendant, "snuffed the old bitch in the bar."

Larry Wood, a friend of defendant and a member of the original trio, confirmed Candelo's testimony in all the important particulars.[2]

---

[2]Defendant had been drinking heavily that evening; Wood loaned defendant one dollar when they were in Quinn's; defendant ran out of Quinn's with a bottle of tequila in his hand after he had kicked the glass out of the door; defendant threw the car keys to Candelo; defendant's hand was bleeding and he washed it off in a Shell station; defendant stated that he "hit the old bitch and something about—something about choking"; defendant said he had some money, and then said something about a cash register.

Michael Howard, another friend of defendant's and the person defendant and Candelo met at 3 a.m. after their return from Lodi, also confirmed Candelo's testimony, especially with regard to defendant stating that he had killed Mrs. Quinn and taken the money from the bar. When defendant got into Howard's car in the early morning hours of January 12, he was carrying a bottle of tequila, saying he took it from the bar.

Miss Diann Courtney, a bar girl at the Fifteen Club in Lodi, testified that on the night in question, defendant, Candelo and Wood were in the club. She recalled a conversation among the three about how easy it would be to rob the old lady at Quinn's.

Harlowe Hansen, a cab driver, drove up to Quinn's Bar at about 2 a.m. on January 12, 1968, to pick Mrs. Quinn up and take her home as was his usual practice. He observed someone, whom he thought to be Mrs. Quinn's son, standing in front of the cash register with his arms in the air. Hansen positively identified defendant as the man he saw in the bar on the night in question. Hansen also noticed two persons sitting in a car parked across the street.

Theodore Busch, a bartender at Harold's Club, was leaving the club at a little after 2 a.m. He heard a glass crash, looked back and saw a man jump out of the front window of Quinn's and run across the street. Busch immediately went back to Harold's Club and called the police.

Lloyd Clark, an employee of Southern Pacific, was working in the early morning hours of January 12 when he heard a crash of glass and saw three young men running away. One of the three was carrying a bottle. He saw one of the young men get into a car, and Clark wrote down the license number "MKY 657." Clark subsequently identified a picture of defendant's automobile.

Officer Yates of the City of Lodi Police Department was given this license number concerning the robbery at Quinn's Bar. On January 12, at approximately 10:20 a.m., Yates came across a stopped vehicle with the license plate "MMY 657." Yates stopped to check the car which was occupied by Candelo and Howard. While talking to Candelo and Howard, defendant came up to the car and stated that the car was his. All three were then taken into custody. When defendant was taken into custody, $45 in bills and $4.90 in change was removed from his person. James Quinn, son of the deceased, was certain that there was money missing from the bar after the incident. A bottle of tequila was later recovered from the glove compartment of Howard's car.

Dr. Ferrari, a specialist in internal medicine, after hearing the facts, testified for the defense that in his opinion he could not determine whether

the death was natural or unnatural. This doctor did not conduct an autopsy.

Several witnesses testified that defendant had a drinking problem, and could not recall what had happened or what he had been doing when under the influence of liquor.

Defendant testified in his own behalf. He stated that when he is under the influence of liquor he cannot recall what happens to him. He corroborated much of what happened that night. However, he testified that all he remembers is getting into his car after leaving the Fifteen Club, tossing the keys to Candelo, and apparently passing out. He denied the slaying and robbery. He awoke the next morning feeling all right with no symptoms of a hangover.

James Peal, a physician and psychiatrist, testified in his opinion and as a result of his interviews with defendant, defendant had suffered from alcoholic amnesia for two periods of time on January 11 and 12, 1968.

■ Defendant contends that the superior court improperly denied his section 995 motion since the defendant had been committed without reasonable or probable cause in that the corpus delicti had not been established. Defendant did not apply for a writ of prohibition (see Pen. Code, § 999a), nor did he move to augment the record to include a copy of the preliminary transcript. Since the transcript was not brought up on appeal, error cannot be assumed in its absence. (*People* v. *Scott* (1944) 24 Cal.2d 774, 777 [151 P.2d 517]; *People* v. *Layman* (1968) 259 Cal.App. 2d 404, 408 [66 Cal.Rptr. 267]; *People* v. *Jones* (1964) 228 Cal.App.2d 74, 90 [39 Cal.Rptr. 302].) Nevertheless, the issue raised hereunder is essentially the same argument posed by defendant's third contention, i.e., the establishment of the corpus delicti, and will be considered here.

The significance of the corpus delicti concept is stated in *People* v. *Quarez* (1925) 196 Cal. 404, 409 [238 P. 363]: " . . . The rule is well settled and the authorities numerous in this state that the extrajudicial statements, admissions, or confession of a defendant cannot be used to establish any necessary element of the *corpus delicti* of the crime charged. The *corpus delicti* must be established by independent evidence before the extrajudicial statements, admissions, or confession of a defendant are admissible." (Accord, *People* v. *Parker* (1954) 122 Cal.App.2d 867, 872 [265 P.2d 933].)

■ In every prosecution for crime, it is necessary to establish the corpus delicti or the elements of the crime. These are (1) the fact of the injury, loss or harm, and (2) the existence of a criminal agency as its cause. (1 Witkin, Cal. Crimes (1963) Elements of Crime, § 88, p. 84.)

 In proving the corpus delicti, direct or positive evidence is not essential; it may be proved by circumstantial evidence and by inferences reasonably drawn therefrom. (*People* v. *Mehaffey* (1948) 32 Cal.2d 535, 545 [197 P.2d 12]; *People* v. *Moore* (1965) 234 Cal.App.2d 29, 31 [44 Cal.Rptr. 184].) Slight or prima facie proof is sufficient. (*People* v. *Mehaffey, supra,* 32 Cal.2d at p. 545.)

 Defendant argues that the ′prosecution having failed to establish the corpus delicti, the testimony of Candelo, Wood and Howard was inadmissible. We do not agree.

It is clear from the record that the corpus delicti was established as to the murder and robbery charges and thus the testimony of the People's witnesses was admissible. (See, *People* v. *Williams* (1961) 193 Cal.App. 2d 394, 398-399 [14 Cal.Rptr. 279]; also, *People* v. *Spencer* (1963) 60 Cal.2d 64, 76-77 [31 Cal.Rptr. 782, 383 P.2d 134].)

Defendant contends that the jury was not instructed on the relevancy of voluntary intoxication to the specific intent required for the crime of robbery. (See Pen. Code, § 22; *People* v. *Deatherage* (1967) 249 Cal. App.2d 363, 368 [57 Cal.Rptr. 501].)

 " . . . In the crime of robbery a necessary criminal element is the existence in the mind of the perpetrator of the specific intent to permanently deprive an owner of his property, and unless such intent exists that crime is not committed." (*Ibid.*) Form 78-B (Revised) of CALJIC,[3] relating to voluntary intoxication and specific intent, was not given with respect to the charge of robbery.[4] (See, *People* v. *Deatherage, supra,* 249 Cal.App.2d at p. 368.) However, the court did read to the jury a modified form of 73-B of CALJIC (Revised), which reads as follows:

## "DIMINISHED CAPACITY TO FORM SPECIFIC MENTAL STATE

"When a defendant is charged with crimes such as murder and robbery which require that a certain specific intent or mental state be established in

---

[3]This form reads:

"Voluntary Intoxication—When Relevant to Specific Intent

"In the crime of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . of which the defendant is accused [in count . . . . . . . . . . . . of the information], a necessary element is the existence in the mind of the defendant of the specific intent to . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"If the evidence shows that the defendant was intoxicated at the time of the alleged offense, the jury should consider his state of intoxication in determining if defendant had such specific intent."

[4]This instruction was given with respect to the crime of murder.

order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom [*sic*] if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physcial [*sic*] condition, however caused, which prevented him from forming the specific intent or mental state essential to constitute the crime or degree of crime with which he is charged."

In addition, the court gave instructions on the concurrence of act and specific intent (CALJIC 71.11 (new)) and diminished capacity, both with respect to murder *and* robbery. We are satisfied the jury was properly instructed and therefore find no error.

Defendant next contends that since the jury did not return a verdict of first degree murder (i.e., felony murder), the jury decided the intent to commit the robbery was formed *after the death* of Mrs. Quinn. He then argues that since the intent to permanently deprive the victim of her personal property was, in the opinion of the jury, found after Mrs. Quinn's death, the jury is absolutely prohibited, as a matter of law, from finding defendant guilty of robbery because one of the essential elements of the crime of robbery was eliminated conclusively. (See, *People* v. *Russell* (1953) 118 Cal.App.2d 136, 138 [257 P.2d 39].) In this respect, section 211 of the Penal Code provides: "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

The verdicts of manslaughter and robbery are possibly but not necessarily inconsistent in view of the prosecution's theory of the case, i.e., a murder committed in the conduct of a felony or robbery. The People try to distinguish this case by pointing out that *force* was used rather than fear. (See, *People* v. *Russell, supra,* 118 Cal.App.2d 136.) There is certainly evidence to support this view. The jury returned a verdict of manslaughter. However, the jury could have been merely extending its compassion to this defendant. An inconsistent verdict is not necessarily invalid. An inconsistent verdict may be caused not by the confusion but the mercy of the jury. (See cases cited in Witkin, Cal. Criminal Procedure (1963) Judgment and Attack in Trial Court, §§ 546, 549, pp. 556-557, 559-560; see also, Annot., 16 A.L.R.3d 866.)

Furthermore, each count must stand upon its own merit and be weighed separately in its disposition (*People* v. *Codina* (1947) 30 Cal.2d 356, 361 [181 P.2d 881]), even though the respective verdicts may be legally inconsistent.

In addition, even if the verdicts here involved are inconsistent, a reversal

would not be required. (*People* v. *Witzel* (1957) 155 Cal.App.2d 486, 492 [318 P.2d 136]; *People* v. *Wallace* (1947) 78 Cal.App.2d 726, 742-743 [178 P.2d 771].) The evidence is sufficient to support both the robbery verdict and the verdict of manslaughter, being a lesser included offense of the crime of murder. The defendant "had the benefit of the jury's compassion, rather than suffering a burden because of its passion . . . . ." (*People* v. *Smith* (1931) 117 Cal.App. 530, 534 [4 P.2d 268]; see also, *Dunn* v. *United States* (1932) 284 U.S. 390 [76 L.Ed. 356, 358-359, 52 S.Ct. 189, 80 A.L.R. 161].)

We find no merit in defendant's claim of insufficiency of the evidence to sustain the verdicts of guilty on each count.

The judgment is affirmed.

Pierce, P. J., and Bray, J.,* concurred.

A petition for a rehearing was denied January 2, 1970, and appellant's petition for a hearing by the Supreme Court was denied February 5, 1970.

---

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.