[Crim. No. 10986. First Dist., Div. Two. Jan. 12, 1973.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS EUGENE BRAUN et al., Defendants and Appellants.

956

**Counsel**

David N. Bortin and David P. Lucchesi, under appointments by the Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Derald E. Granberg, Deputy Attorney General, for Plaintiff and Respondent.

**Opinion**

KANE, J.—Defendants Thomas Eugene Braun ("Braun") and Leonard Eugene Maine ("Maine") appeal[1] from their respective judgments of conviction entered on jury verdicts finding both of them guilty of kidnaping and murdering Timothy Luce ("Tim"), kidnaping and raping Susan B.

[1] Since Braun was sentenced to death, his appeal is automatic under Penal Code, section 1239, subdivision (b). Maine's appeal has been consolidated with Braun's.

("Susan"), and finding Braun guilty of assaulting Susan with intent to commit murder.

## Prosecution Evidence

Tim and Susan, the two teenage victims of the crimes, were residents of Ukiah, California. On the evening of August 21, 1967, shortly before 6 p.m., they left Ukiah in a car and drove to a wrecking yard in Hopland. During the return trip something went wrong with their car. They pulled over and started walking back toward Ukiah. They were given a ride by Braun and Maine who were driving south but turned around and drove back to pick them up. Braun and Maine were driving a 1967 light green Buick sedan acquired in Oregon after they killed the driver, Samuel Ledgerwood.

Susan testified that Maine was driving the car when they were picked up. After traveling a short distance they turned off the highway whereupon Tim and Susan were suddenly threatened and guns were pointed at them. Susan saw two pistols. While Maine stayed in the car with her, Braun left with Tim and a shot was heard by Susan. After the shot, Braun came back to the car and Susan heard the defendants talking about a wallet and about $6. Sometime before 7 p.m. the same day, Tim's body was found on a small roadway adjacent to a vineyard south of Ukiah. As later determined, Tim's death was caused by a single gunshot wound in the nape of the neck at the base of the skull.

Shortly after Tim's murder, Braun and Maine resumed driving south, taking Susan with them. During this journey, they stopped three times— at a service station, a restaurant and a motel. Before reaching the motel, Braun and Maine talked about wanting money from Susan's parents, but she told them that her parents had no money. Arriving at the motel, Susan was taken to a cabin where first Braun, then Maine, raped her. Sometime later they got back in the car and resumed driving. At about 10 or 11 p.m. they reached another motel on Highway 99, north of Turlock, where Braun registered. After a couple of hours' stay, they left that motel, too. Susan was shot thereafter by Braun while she was outside the car. The evidence indicates that she was shot shortly before 5 a.m. on August 22, 1967, and her body was thrown into a ditch from which she crawled up back to the roadway where she was discovered by Mr. and Mrs. Mease at about 6 a.m. Before the arrival of the authorities, Susan spoke to Mrs. Mease, giving a recount of the shootings and a description of the perpetrators and the getaway car. Acting upon this information given by Mrs. Mease the police arrested appellants in the Jamestown Hotel, Jamestown, California, at about 9:15 a.m.

In the room occupied by Maine the officers found a plastic carrying case which contained a blanket, a .22 caliber Ruger automatic, and a .22 caliber Colt single-action pistol. Both pistols were fully loaded. In the pocket of a pair of jeans found in Maine's room the officers found a wallet, some change and a number of .22 caliber hollow-point bullets. In the pocket of a pair of jeans found in Braun's room the officers found a car key, two wallets and a number of .22 caliber hollow-point bullets. During the search of the Buick, which took place after it had been towed to the Sonora police station, the officers found two suitcases and a .35 caliber Remington rifle. One of the suitcases contained seven boxes of .22 caliber cartridges and a box of .35 caliber Remington cartridges. A fingerprint examiner who processed the vehicle found prints which he identified as those of Tim, Susan, Braun and Maine. A criminalist testified that, in his opinion, a cartridge casing found by Tim's body and four cartridge casings found near Susan on the highway were all fired from the Ruger .22 caliber automatic pistol found in Maine's room. The same criminalist testified that, in examining a pair of tennis shoes found in Braun's room, he discovered stains of human blood on the right shoe. These stains were of blood group A, which was Susan's blood type. Tim's blood type was O, as was the blood type of both appellants.

### The Defense

Maine took the stand in his own behalf and testified that after Tim and Susan had been picked up by them, Braun directed him at gunpoint to leave the highway and turn onto a gravel road. It was Braun, according to Maine, who shot Tim while he and Susan remained in the car. Maine also stated that there was no talk between Braun and himself about kidnaping, raping or shooting and that he did not take Tim's wallet. He maintained that he was continuously afraid of Braun following the murder of Deana Buse by Braun in Washington, and insisted that he raped Susan in fear of his life. On cross-examination, however, he admitted that he experienced no difficulty in accomplishing intercourse with Susan. Maine finally testified that neither the bloodstained tennis shoes nor the suitcase containing ammunition were his, and explained the presence of the .22 caliber shells in his pocket by asserting that he and Braun previously had done some target shooting.

Dr. Van Dusen, a clinical psychologist, also testified in Maine's defense. In his opinion Maine's overall I.Q. was 84, which placed him in the borderline mental retardation area. He expressed his belief that although Maine was not psychotic he was an inadequate person whose ability to stand up against a dominant person was less than average. Dr. Amini, a psychiatrist,

also called in Maine's defense, reaffirmed that Maine's intelligence is lower than normal and that he is an inadequate personality who follows others' instructions automatically. In his opinion, Maine did not have the capacity to meaningfully deliberate and premeditate, and was incapable of forming an intent to kill.

Braun did not testify at the trial. In his behalf the defense called Dr. Handrich, a clinical psychologist, and Dr. Catton, a psychiatrist. Dr. Handrich expressed his expert opinion that Braun is a pseudo-psychopathic schizophrenic who behaves like a psychopath showing no conscience and concern about moral values, and is free of anxiety of internal guilt and indifferent to the rules of the world. He opined that Braun lacked capacity to maturely reflect and appreciate what he was doing and he was acting automatically as a function of unconscious impulses. In his opinion, Braun did not have the mental capacity to harbor malice aforethought. Dr. Catton, who testified at the guilt phase of the trial, stated that he found Braun's intelligence to be average or better, with an I.Q. of 110. In his opinion, Braun did not suffer from schizophrenia nor was he psychotic or psycho-neurotic. Although Braun's history indicated a rather extensive use of alcohol, his demeanor and attitude showed no departure from normal and his reasoning and understanding were adequate. Notwithstanding the fact that Braun knew the nature and quality of the crimes, in Dr. Catton's opinion the element of deliberation was absent because Braun simply did not take time to consider, weigh and examine each step of the happenings. Dr. Catton found Braun immature in both body and mind.

In rebuttal, the prosecution called Doctors Rappaport and Rood, psychiatrists. *With regard to Maine,* Dr. Rappaport testified that Maine had the mental ability to meaningfully premeditate and deliberate, to entertain malice, and to form an intent to rob and rape. With respect to Susan's rape by Maine, Dr. Rappaport expressed his opinion that a person seriously in fear of his life would be greatly impaired in his ability to consummate the act of intercourse. Dr. Rood found Maine's intelligence to be in the normal range and confirmed Dr. Rappaport's opinion that Maine had the capacity to deliberate, to entertain malice, and to form intent to kill, to rob and rape. Alluding to Susan's rape by Maine, he expressed the opinion that fear of life and the ability to engage in sexual intercourse are incompatible. *Concerning Braun,* Dr. Rappaport testified that Braun is a sociopath who understands and appreciates what behavior is unacceptable to society but for one reason or another commits the wrongful act because it may bring profit, pleasure, or simply to prove that he is able to do it and get away with it. He found no trace of psychosis or symptoms of schizophrenia in Braun. The same was reaffirmed by Dr. Rood, who stated that Braun committed the

acts knowingly. He based his opinion on information gained from Braun who told him that he killed Tim in order to get the girl and to avoid detection. Braun also told him that he attempted to kill Susan for similar reasons to evade discovery, and that the usage of false names at the Jamestown Hotel served the same purpose.

The jury found both appellants guilty of murdering Tim, and fixed the degree at first as to Braun and second as to Maine. The jury also found both appellants guilty of kidnaping Tim, and both guilty of kidnaping and raping Susan. In addition, Braun alone was found guilty of assaulting Susan with intent to commit murder. At the end of his penalty trial, the jury, in its verdict, fixed Braun's penalty at death. At the ensuing sentencing procedure the court denied probation and sentenced Maine to state prison for the term prescribed by law as to each conviction and ordered the sentences to run consecutively as to each count. Braun was sentenced to death on the murder conviction and was sentenced to state prison for the term prescribed by law on all the remaining convictions, each to be served consecutively.

We, of course, are compelled, under the mandate of *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880], to modify the death penalty sentence so as to provide life imprisonment. By virtue of the erasure of the death penalty several issues raised by Braun have been rendered moot. These include: (1) his assertion that the jury selection process violated the rule laid down in *Witherspoon* v. *Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1170], and (2) miscellaneous claims of error during the penalty phase itself. We point out, however, that despite the mootness of these issues, we have examined each of them and find them to be totally lacking in merit.

Before discussing the issues remaining on appeal, one further general observation must be made. Although Braun does not explicity charge that the court and the prosecution committed misconduct, by way of oblique hints he implies that the prosecutor and the judge displayed a vindictive zeal or attitude which may have colored the entire trial. We reject these unfounded and unsupported general charges. The record as a whole convinces us that the trial was conducted in an antispetically and scrupulously fair manner and that there was no misconduct by either the trial judge or the prosecution.

### Braun's Appeal

a) *Right to Representation:*

Braun moved both before and during trial to dismiss Mr. Orchard, his court-appointed attorney ("Orchard"), asserting a variety of reasons which

the trial court carefully explored. Finding no merit in Braun's contentions, the trial court denied his motions to dismiss Orchard. Braun now contends that he was entitled to a change of counsel as a matter of law and that the trial court's denial of his motions deprived him of his right to effective counsel. Implicitly he also raises the issue of right to self-representation.

■ (1) *Right to change of counsel:* It is well settled that if a defendant becomes dissatisfied with the manner in which his counsel has handled his case and wishes to discharge his counsel for that reason, he has a right to do so subject to the supervisory power of the trial court to see that such discharge does not result in an uninformed and unintelligent waiver of the right to counsel (*People* v. *Norman* (1967) 252 Cal.App.2d 381, 401 [60 Cal. Rptr. 609]). However, the cases also make it unmistakable that there is no constitutional right to an attorney who will conduct the defense of the case in accordance with an indigent defendant's whims (*People* v. *Floyd* (1970) 1 Cal.3d 694, 704 [83 Cal.Rptr. 608, 464 P.2d 64]; *In re Luna* (1968) 257 Cal.App.2d 754, 757 [65 Cal.Rptr. 121]), and the defendant's right to a court-appointed counsel does not include the right to require the court to substitute counsel *except in a situation where the record clearly shows that the first appointed counsel is not adequately representing the accused* (*People* v. *Williams* (1970) 2 Cal.3d 894, 904 [88 Cal.Rptr. 208, 471 P.2d 1008]; *People* v. *Bourland* (1966) 247 Cal.App.2d 76, 84-85 [55 Cal.Rptr. 357]). ■ To justify relief on this latter ground an extreme case must be presented showing that counsel's lack of diligence or competence reduced the trial to " 'a farce or sham' " (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]). The determination of whether counsel is performing his duty in a competent manner involves an exercise of discretion by the trial judge, and in the absence of a showing of abuse of discretion his ruling should not be disturbed on appeal (*People* v. *Vaughn* (1969) 71 Cal.2d 406 [78 Cal.Rptr. 186, 455 P.2d 122]; *People* v. *Foust* (1968) 267 Cal.App.2d 222, 228 [72 Cal.Rptr. 675]).

■ Braun admits that the representation provided him at the trial was not a "farce or sham" and that he had adequate assistance of counsel. He insists, however, that replacement of his counsel should have been required because disagreement existed between Orchard and himself on fundamental trial tactics; moreover, that the denial of dismissal of counsel prevented him from exercising his constitutional right to testify in his own behalf. Additionally, he brings up certain instances of tactical error on the part of Orchard and complains that Maine's attorney supplied a defense superior to that given himself. As appears below, none of these contentions is meritorious.

Braun's first argument on conflicts in fundamental trial tactics is based upon the principle set forth in *People* v. *Moss* (1967) 253 Cal.App.2d 248, 251 [61 Cal.Rptr. 107], where the court stated: "We believe the basic right to representation by counsel, made so clear by *Gideon* v. *Wainwright*, 372 U.S. 335, 344 . . ., encompasses the right to the appointment of different counsel when a legitimate difference of opinion develops between a defendant and his appointed counsel as to a fundamental trial tactic." Such a principle, however, no longer represents the applicable law.[2] After having cast doubt upon its validity in two previous cases *(People* v. *Maddox* (1967) 67 Cal.2d 647, 654, fn. 2 [63 Cal.Rptr. 371, 433 P.2d 163]; *People* v. *Floyd*, *supra*, at p. 705), the Supreme Court explicitly disapproved it in *People* v. *Williams*, *supra*, at page 906. ▮ The applicable law, on the other hand, is well stated in *In re Luna*, *supra*, at page 757, that there is no duty upon the court to relieve the court-appointed attorney simply because he and the defendant disagree on strategy. Similarly, the court emphasized in *People* v. *Foust*, *supra*, at page 229, that a court-appointed attorney is not required to accede to his client's wishes in matters where experience, sound judgment, law or ethics are not consistent with his client's best interests.[3]

▮ In the case at bench the fundamental discord on trial tactics consisted of a disagreement as to whether Braun should plead guilty and submit the issue of penalty to the court as Orchard suggested, or whether both these issues should be resolved by jury trial according to Braun's preference. The circumstances of the case make it crystal clear that the strategy recommended by Orchard, although not accepted, was entirely proper, justified and reasonable. The proof of Braun's guilt was overwhelming, resting not only on circumstantial evidence, but also on the direct testimony of Susan, the surviving victim of the crime. The offenses were vicious, displaying great and depraved brutality. In such circumstances it was a dictate of legal experience and professional judgment to admit the facts and submit the penalty issue to the court (cf. *People* v. *Stanworth* (1969) 71 Cal.2d 820 [80 Cal.Rptr. 49, 457 P.2d 889]; *People* v. *Reeves* (1966) 64 Cal.2d 766 [51 Cal.Rptr. 691, 415 P.2d 35]). Likewise, contrary to Braun's objection, Orchard's tactic to introduce the testimony of Braun's sister at the penalty

---

[2]It should be noted, in fairness to Braun's appellate counsel, that *People* v. *Williams* was not decided until two months after the filing of his closing brief.

[3]We note that Braun's reliance on *People* v. *Crovedi* (1966) 65 Cal.2d 199 [53 Cal.Rptr. 284, 417 P.2d 868] is also grossly misplaced. *Crovedi* involved a different issue, namely whether a defendant who *hires* an attorney is free to replace the same. The court was emphatic to point out in *Crovedi* that " 'Regardless of whether petitioner would have been entitled to the appointment of counsel, his right to be heard through his own counsel was unqualified.' " (P. 206; italics added.)

phase in mitigation of the possible punishment reflected professional competence and sound judgment.

■ Braun's next contention that by denial of replacement of his counsel he was prevented from testifying at the trial on his own behalf is simply not supported by the record. While it is true that Orchard, in his professional judgment, tried to discourage Braun from taking the stand in his own behalf, Braun was sufficiently advised by both Orchard and the trial judge that he had a constitutional right to do so. The record also establishes that Braun's decision not to testify was his own personal choice and neither the trial judge nor Orchard precluded him from testifying. Since, however, Braun was admittedly accorded an adequate legal defense and therefore was not entitled to replacement of his attorney, he was not allowed to achieve the same by imposing an impermissible condition on exercising his constitutional right to testify in his own behalf.

■ In justification of his right to discharge his attorney, Braun additionally assigns certain technical errors allegedly committed by Orchard, such as his failure to cross-examine codefendant Maine or rebut his testimony by direct evidence; his failure to control the direct examination of Doctors Handrich and Catton, expert witnesses testifying for the defense; his failure to get his case separated from that of Maine; his making remarks in his opening statement about the heinous nature of the crimes; his producing only one sympathetic witness and even that at the wrong time; his creating adverse publicity; his failure to provide Braun a defense as good as that accorded Maine.

In answering these charges it suffices to say that under well established law an attorney representing a criminal defendant has the power to control the court proceedings (*People* v. *Hill* (1967) 67 Cal.2d 105, 114-115 [60 Cal.Rptr. 234, 429 P.2d 586]; *People* v. *Foster* (1967) 67 Cal.2d 604, 606 [63 Cal.Rptr. 288, 432 P.2d 976]; *People* v. *Darling* (1962) 58 Cal.2d 15, 19 [22 Cal.Rptr. 484, 372 P.2d 316]), and in order to show that no effective counsel was provided, it is not enough to allege that the attorney's tactics were poor or that the case might have been handled more effectively (*People* v. *Floyd, supra,* at p. 709; *People* v. *Reeves, supra,* at p. 773; *People* v. *Brooks* (1966) 64 Cal.2d 130, 140 [48 Cal.Rptr. 879, 410 P.2d 383]). In view of these rules, together with Braun's admission that he had been given adequate assistance of counsel, it needs no further elaboration that the technical errors here asserted fail to constitute a basis to establish the ineffectiveness of counsel or to prove that the trial court abused its discretion by denying the replacement of counsel upon the stated grounds.

On the contrary, the record clearly supports the trial court's implied finding that "there was not a breakdown of the attorney-client relationship of such magnitude as to substantially impair defendant's right to the assistance of counsel" (*People* v. *Williams, supra,* at p. 905).

■ (2) *Right to self-representation:* It is now clearly established that an accused has no constitutional right to self-representation in criminal cases (*People* v. *Sharp* (1972) 7 Cal.3d 448 [103 Cal.Rptr. 233, 499 P.2d 489]). While this holding does not rule out that an accused *may* be accorded a right to self-representation in a proper case (*People* v. *Sharp, supra,* at p. 461), under the general rule a defendant may waive his right to counsel and represent himself but only if he has an intelligent conception of the consequences of his act and understands the nature of the offense, the available pleas and defenses, and the possible punishment. The decision whether a defendant is capable of making a knowing and intelligent election is a discretionary matter trusted to the sound discretion of the trial court which is subject to review only in case of clear abuse (*People* v. *Floyd, supra,* at pp. 702-703).

■ Applying these principles to the record before us, it becomes manifest that Braun, a young man 19 years of age, stood charged with the most serious of crimes including a capital offense. He had no higher education, no prior criminal court experience, had taken no courses in law and did not know anything about the rules of evidence; and, finally, after a very thorough examination by the trial judge, Braun readily admitted that he was not qualified to handle his case. Under these circumstances the denial of right to self-representation was not only proper, but imperative.

b) *Admissibiltiy of the Victim's Testimony:*

■ Braun advances the argument that Susan's testimony was inflammatory far beyond any probative value and that the court should not have adjourned to the medical center without requiring any offer of proof. He insists that the stipulation of the defense attorneys as to the facts should have been introduced instead. We disagree.

The facts reveal that the testimony of Susan, the only survivor of the crimes charged, was highly relevant. Apart from her testimony, the entire case of the prosecution was based on circumstantial evidence. She was the only prosecution witness who could recount the events which took place from the time she and Tim were picked up until she was shot. Only she could testify that both appellants raped her, that they talked about getting money from her parents, that Maine stayed in the car while Tim was shot, and that it was Braun who shot her while Maine remained in the car. She

was virtually the only witness who was able to provide testimony as to the circumstances of Tim's robbery. It follows that Susan's appearance as a witness is not susceptible to legitimate challenge; nor is the fact that her testimony was taken at a hospital. The evidence at hand is too strong to dispute that transporting her to the courtroom would have subjected Susan to unnecessary risk; and, considering her condition, her testimony, of necessity, had to be taken at a place where hospital facilities and services were available if needed.

Evidence Code, section 351, provides that, as a general rule, all relevant evidence is admissible. Section 352 sets up an exception to the above general rule vesting the trial court with discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice. Under the case authorities the exception thus carved out is strictly restricted to inflammatory *demonstrative* evidence, such as gruesome photographs, motion pictures, etc. (cf. *People* v. *Davis* (1965) 62 Cal.2d 791 [44 Cal.Rptr. 454, 402 P.2d 142]; *People* v. *Ford* (1964) 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892]). As Witkin points out, in some cases, e.g., personal injury or death actions or criminal prosecutions for murder, the relevant *physical objects or photographs* may be so gruesome or shocking as to prejudice a party before the jury and therefore subject to exclusion under the discretionary power vested in the trial judge (Witkin, Cal. Evidence (2d ed. 1966) § 633, p. 595). Braun refers to no case or other authority which might suggest that the above stated exception would extend to testifying crime victims who have suffered the misfortune of disabling or disfiguring wounds.

Braun's second contention concerning the need of offering proof is totally specious. From the record it is clear that no one challenged the relevance of Susan's testimony, nor was there a request that the prosecutor make an offer of proof with regard to her testimony.

## Maine's Appeal

a) *Search and Seizure:*

Maine argues that the guns, ammunition and other items seized in his and Braun's hotel room and in the car were unlawfully admitted in evidence because (1) no probable cause existed for their arrest; (2) the police failed to comply with the provisions of Penal Code, sections 841 and 844; and (3) the car search was too remote in time and place to be searchable as incident to arrest. We answer these contentions seriatim.

(1) *Probable cause:* It is well established that a police officer may lawfully arrest a person without a warrant if the arresting officer has reason-

able cause to believe that the person arrested has committed a felony. Reasonable or probable cause has been defined as such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime (*People* v. *Prather* (1969) 268 Cal.App.2d 748, 751 [74 Cal.Rptr. 82]). The cases emphasize that the rule of probable cause is a practical, nontechnical conception. ▇ In determining whether there is probable cause, each case must necessarily be decided upon its own facts and circumstances or, as sometimes said, " 'on the total atmosphere of the case' " (*People* v. *Gardner* (1967) 252 Cal.App.2d 320, 324 [60 Cal.Rptr. 321]). ▇ It is also recognized beyond dispute that reliable information furnishing probable cause for an arrest does not lose its reliability when it is transmitted through official channels to arresting officers and the latter merely rely upon it when making an arrest (*People* v. *Hogan* (1969) 71 Cal.2d 888, 891 [80 Cal.Rptr. 28, 457 P.2d 868]).

▇ When the instant case is viewed in light of the foregoing principles it becomes more than evident that probable cause existed for appellants' arrest and the finding of the trial court to this effect is amply supported by evidence.

As pointed out earlier, Susan was found critically wounded by Mr. and Mrs. Mease and their family. After a telephone call to the police, Officer Berry arrived at the scene of the crime at about 7:20 a.m. Although Susan was by then unconscious, Officer Berry was informed by Mrs. Mease that Susan told her that she had been shot by two boys who were driving a light green 1967 Mercury with Oregon license plates and the names of the boys were Mike and John. Susan also told Mrs. Mease that the boys had shot her boyfriend and pushed him out of the car. Officer Berry immediately contacted the sheriff's office and the information gained from Mrs. Mease was radioed to the police beginning at about 7:30.

The two officers who later arrested appellants in their Jamestown hotel rooms and carried out the search here complained of were Lieutenants Andre and Endicott. Lieutenant Andre acquired the first information about the crime and the description of the car through telephone at 6:30 a.m. The second information came to him through a radio broadcast at 9:20 a.m. while on patrol. Later, when he returned to the sheriff's office, he was informed that Constable Chafin had found a car in Jamestown which fitted the description with the exception that it was a Buick, not a Mercury. Lieutenant Endicott got direct information from Officer Berry that the car being looked for had been found in Jamestown. Both Andre and Endicott

had been informed before getting to the scene of the arrest that the names of the two arrestees were Mike and John.

Arriving at the Jamestown Hotel, the officers spotted the car, then proceeded to talk to the manager and to check the register. They learned from the register that Mike Ford and John Ford of Portland, Oregon, had registered the same day at 7:15. The manager confirmed that they had registered at 7:15 or 7:20, and described them as two young men around twenty. Thereupon, the officers embarked upon the arrest of appellants in their respective hotel rooms.

Recognizing that the preceding facts were more than sufficient to establish probable cause for arrest, Maine contends that the legality of the arrest was vitiated because Mrs. Mease, who conveyed the information to the police, was not an eyewitness to the crime. We reject this argument as completely unfounded.

The cases make it clear that an arrest may be based solely on the information of an untested informant who is not a victim of, or eyewitness to, the crime in cases of pressing emergency (*Willson* v. *Superior Court* (1956) 46 Cal.2d 291, 294 [294 P.2d 36]). Moreover, it is well settled that information given by an untested informant is sufficient if it is corroborated in essential respects by other facts, sources or circumstances. It is enough if such corroboration gives the officer reasonable grounds to believe that the informant is telling the truth, because in this type of case the issue is not whether the information obtained by the officers emanated from a reliable source but whether the officers could reasonably rely upon that information under the circumstances (*Ojeda* v. *Superior Court* (1970) 12 Cal.App.3d 909, 918 [91 Cal.Rptr. 145]). Finally, the cases point out that the internal trustworthiness of the statement itself may be sufficient to justify reliance upon information received from one whose reliability has not been previously tested (*Ming* v. *Superior Court* (1970) 13 Cal.App.3d 206, 213 [91 Cal.Rptr. 477]). The information given by Mrs. Mease must be held reliable upon each or all of the above tests, because there was a pressing emergency, the commission of a grievous and brutal crime was corroborated by circumstances other than her information, and, finally, the information itself displayed an internal trustworthiness justifying reasonable reliance by the police.

(2) *Compliance with Penal Code, sections 841 and 844:* Penal Code, section 841, provides that a person making an arrest must inform the arrestee of his intention to arrest him, of the cause for arrest and the authority to make it. Section 844 requires that a person making an arrest demand admittance and explain the purpose for which admittance is desired before

making a forcible entry to effect the arrest. It is undisputed that the officers in the case at bench did not comply with either section of the code. ▉ However, it is established beyond dispute that strict compliance with these provisions is not required and a failure to comply therewith is excused if the officer acts in a good faith belief that compliance would increase his peril (*People* v. *Smith* (1966) 63 Cal.2d 779, 797 [48 Cal.Rptr. 382, 409 P.2d 222]; *People* v. *Gilbert* (1965) 63 Cal.2d 690, 706-707 [47 Cal.Rptr. 909, 408 P.2d 365]; *People* v. *Hammond* (1960) 54 Cal.2d 846, 854 [9 Cal.Rptr. 233, 357 P.2d 289]; *People* v. *Robinson* (1969) 269 Cal.App. 2d 789, 792-793 [75 Cal.Rptr. 395]).

▉ It is patently beyond dispute that the officers here acted in a good faith belief that compliance with the statute would increase their peril. When the officers made the arrest they reasonably believed that Mike and John had killed Tim and had shot Susan and left her for dead. The record also divulges that the officers did entertain a good faith belief that the two young men were still armed and dangerous. This is graphically manifested by the circumstance that before making the arrest the officers cleared the hotel and called for additional help. In addition, Lieutenant Endicott testified that he was concerned that there might be gunfire. Lieutenant Andre also stated in his testimony that he was concerned about his safety and the safety of the officer with him, especially because he had been shot before. These facts unquestionably establish that compliance with the cited code sections was excused in the case at bench.

▉ (3) *Legality of car search:* The evidence discloses that the search of the car used by appellants took place at the police station three to four hours after appellants' arrest in the hotel. Relying on these facts, Maine contends that the search of the car was too remote in time and place to be considered a valid search incident to arrest. The flaw in this argument is simply that the search complained of was not protected by the Fourth Amendment.

As the court emphasized in *People* v. *Webb* (1967) 66 Cal.2d 107, 123-124, footnote 3 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708], when the police lawfully seize a car which is *itself evidence* of a crime rather than merely a container of incriminating articles, they may postpone searching it until arrival at a time and place in which the examination can be performed in accordance with sound scientific procedures. The same principle was reiterated in *People* v. *Teale* (1969) 70 Cal.2d 497 [75 Cal.Rptr. 172, 450 P.2d 564], and even more recently in *North* v. *Superior Court* (1972) 8 Cal.3d 301 [104 Cal.Rptr. 833, 502 P.2d 1305].

The record at hand demonstrates without doubt that the automobile itself

constituted evidence admissible against appellants for the very crimes for which they were arrested. It was the vehicle which was used during the kidnaping of Tim and Susan, the murder of Tim, and the attempted murder of Susan. That the vehicle was so considered by the police is also apparent from the record. Prior to, during, and subsequent to appellants' arrest, careful steps were taken to safeguard the vehicle (cf. *People* v. *Williams* (1967) 67 Cal.2d 226, 230 [60 Cal.Rptr. 472, 430 P.2d 30]). Constable Chafin and his deputy shared the responsibility for guarding it until it was towed to the police station, and the criminalist who later took the fingerprints personally supervised its removal to preserve fingerprints and other possible evidence of crimes. The fingerprints taken from the car produced conclusive evidence which connected appellants with the offenses charged.

We conclude that since the arrests of appellants were lawful, the car as the evidence of the crimes charged was properly seized and its later examination at the police station did not constitute a search protected by the Fourth Amendment. In light of our conclusion we need not consider whether the search in question would have been justified on the additional ground that the car was stolen (cf. *Jones* v. *United States* (1960) 362 U.S. 257 [4 L.Ed.2d 697, 80 S.Ct. 725]; *People* v. *Ortiz* (1969) 276 Cal.App.2d 1 [80 Cal.Rptr. 469]), or the search was rightly postponed upon the authority of *Chambers* v. *Maroney* (1970) 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975]; *People* v. *Williams, supra,* 67 Cal.2d 226; and their companion cases.

b) *Admissibility of the Court-Appointed Psychiatrists' Testimony:*

■■■■ Maine contends that the court-appointed psychiatrists' testimony relating to appellants' admissions was erroneously admitted in evidence because appellants were misled with respect to the purpose of, and their constitutional rights concerning, the examinations by the court-appointed psychiatrists. Additionally, he argues that his conviction must be reversed also upon the ground that codefendant Braun's alleged admission or confession was received in evidence in violation of the *Bruton-Aranda* rule. We find no substance in either of these contentions.

(1) The rules relating to the conditions under which the testimony of a court-appointed psychiatrist is admissible at trial are clearly outlined in *In re Spencer* (1965) 63 Cal.2d 400 [46 Cal.Rptr. 753, 406 P.2d 33]. ■■■■ Accordingly, before submitting to an examination by court-appointed psychiatrists, a defendant must be represented by counsel or intelligently or knowingly have waived that right. Defendant's counsel must be informed as to the appointment of such psychiatrists. If, after submitting to an examination, the defendant does not specifically place his mental condition in issue at

the guilt trial, then the court-appointed psychiatrist is not permitted to testify at the guilt trial at all. However, where the defendant himself places his mental condition in issue at the guilt trial, then the court-appointed psychiatrist is permitted to testify subject to an admonition by the court advising the jury that the psychiatrist's testimony as to any incriminating statements cannot be regarded as proof of the truth of the facts disclosed by such statements but may be considered only for the limited purpose of showing the information upon which the psychiatrist based his opinion (*In re Spencer, supra,* at p. 412). The rationale of the *Spencer* rule is simply that if the defendant specifically places his mental condition in issue at the guilt trial, he cannot preclude expert testimony on a subject that he himself injected into the trial. In short, he cannot have his cake and eat it, too.

 The record before us unequivocally reveals that, at the time of submission to examination by Doctors Rood and Rappaport, both appellants were represented by counsel, who were not only informed concerning the appointment of the psychiatrists but who also influenced the timing and scope of the examinations. The record also reveals that both appellants entered pleas of not guilty by reason of insanity to all pending charges, and during the guilt phase placed their respective mental conditions in issue. Thus Maine called Dr. Van Dusen, a clinical psychologist, and Dr. Amini, a psychiatrist. Braun called Dr. Handrich, a clinical psychologist. Since both appellants had placed their mental condition in issue, under *Spencer* the prosecution was fully justified in calling the court-appointed psychiatrists to testify in rebuttal. In addition, the court fully complied with the admonitory duty prescribed by *Spencer*.

 Appellants' claim that they were misled with respect to the purpose of the psychiatric examination finds no support in the evidence. On the contrary, the record discloses that Dr. Rood did inform Braun that the result of his examination would be reported to the court at trial; Dr. Rood also denied telling Mr. Poulos, Maine's attorney, that the information from his client about specific facts would not be divulged before the jury. Although Braun testified to an understanding that the examinations would be used to determine his sanity but the personal facts of the case would not be brought out in open court, and but for this understanding he would never have told the psychiatrists a lot of things about his personal life, his testimony created only a conflict in the evidence, which was resolved by the trial judge who found that neither Braun nor Maine was misled concerning the purpose of the psychiatric examinations. Considering the entire record, the finding of the trial judge is amply supported by sufficient evidence.

 (2) Relying upon *Bruton* v. *United States* (1968) 391 U.S. 123

[20 L.Ed.2d 476, 88 S.Ct. 1620], and *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], Maine asserts that his conviction must be reversed as a matter of law because his codefendant Braun's "confessions" which seriously implicated him were admitted in evidence.

It has been held in a number of cases that the accused's right to confrontation is violated when a *confession* of a nontestifying codefendant implicating the accused is admitted in evidence (*Douglas* v. *Alabama* (1965) 380 U.S. 415 [13 L.Ed.2d 934, 85 S.Ct. 1074]; *Pointer* v. *Texas* (1965) 380 U.S. 400 [13 L.Ed.2d 293, 85 S.Ct. 1065]; *Bruton* v. *United States, supra*), and the admission in evidence of a confession implicating both defendants is not necessarily cured by an instruction that it is to be considered only against the declarant (*Bruton* v. *United States; People* v. *Aranda,* both *supra*). The obvious rationale of this principle lies in the justified presumption that the jury is unable to follow an instruction which says, in essence, that "a confession is true insofar as it admits that A has committed criminal acts with B and at the same time effectively ignore[s] the inevitable conclusion that B has committed those same criminal acts with A." (*People* v. *Aranda, supra,* at p. 529.)

It is conceded that the above presumption might well fit a confession or other admission which is admitted as *substantive* evidence of an extremely persuasive nature against one of the defendants. Its applicability, however, is highly questionable, to say the least, in such a case as the one before us where Braun's statements to the psychiatrists were admitted only to show information upon which the opinions as to Braun's mental condition were based, and not as substantive evidence on the issue of guilt. We believe that in such a situation the jury is not confronted with the dilemma described in *Aranda* and is able to follow the instruction (as was given here) that the psychiatrists' testimony should be considered as to the nontestifying defendant only.

But even if assumed *arguendo* that the foregoing rule applies to *any* extrajudicial statement of one defendant which implicates a codefendant (cf. *People* v. *Aranda, supra,* at p. 530), such an assumption is of no benefit to Maine under the facts here presented.

It is well established that the mere finding of a violation of the *Bruton* rule does not automatically require the reversal of the ensuing conviction. In some cases the properly admitted evidence of guilt is so overwhelming and the prejudicial effect of the codefendant's admission is so insignificant by comparison that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error (*Schneble* v. *Florida* (1972) 405

U.S. 427, 430 [31 L.Ed.2d 340, 344, 92 S.Ct. 1056]; see also *People* v. *Aranda, supra,* at pp. 526-527).

The record before us is overwhelmingly convincing that the errors, if any, were harmless beyond a reasonable doubt. The most serious error claimed is that in face of Maine's testimony that he had no prior knowledge that Braun was going to shoot Tim or to rape Susan, Dr. Rappaport testified that both defendants had discussed the killing of Tim just prior to its perpetration. A closer examination of the record, however, reveals that while Dr. Rappaport testified that Maine knew of Braun's intention of killing Tim, he also stated that Maine did not agree to it and did not approve of it. It is quite apparent that this testimony did not prejudice, but rather helped, Maine. ■■■ It is a well known rule of law that mere knowledge of his codefendant's criminal intent without sharing the same does not make a defendant criminally liable either on the basis of conspiracy (*People* v. *Gilbert, supra*), or aiding and abetting (*People* v. *Butts* (1965) 236 Cal.App.2d 817 [46 Cal.Rptr. 362]; *People* v. *Demes* (1963) 220 Cal.App.2d 423 [33 Cal. Rptr. 896]). ■■■ It is likewise obvious that Dr. Rappaport's testimony that Braun became closely attached to Maine did not by itself refute Maine's contention that on occasions he was threatened, forced, and dominated by Braun, or that he was afraid of him.

The third claimed error centering on the dispute whether appellants stopped at a motel before entering California seems to be almost irrelevant in the light of the whole record which provides overwhelming evidence as to Maine's guilt. We finally note that the fourth assigned error concerning the refutation of Maine's testimony that he experienced painful nightmares does not fall within the *Aranda* rule. The record confirms that Dr. Rappaport's rebuttal testimony related to a previous conversation with Maine, not Braun. It is obvious that this testimony could have been rebutted or contradicted simply by recalling Maine to the witness stand.

We conclude that the assigned *Aranda* errors, if any, were entirely harmless and, furthermore, that the evidence as a whole establishes Maine's guilt beyond a reasonable doubt. Consequently, under the rule expressed in *Schneble* v. *Florida, supra,* the alleged improper use of the "admission" must be considered harmless.

c) *Consistency of First and Second Degree Murder;*
 *Sufficiency of Evidence:*

■■■ Maine next argues that the jury verdict convicting him of second degree murder is erroneous as a matter of law because it is inconsistent with the verdict which found his codefendant Braun guilty of first degree murder.

He also claims that the evidence fails to support his conviction of second degree murder. We disagree.

In view of the record at hand we fail to find any inconsistency between the two verdicts. It seems obvious that the jury might have found Maine guilty of second degree murder upon the theory that Tim was murdered during the perpetration of kidnaping in which Maine participated and thereby became guilty of felony murder in the second degree.[4] The theory of diminished capacity also affords a possible explanation for the jury's verdict. According to the expert testimony furnished by Dr. Amini, Maine did not have the capacity for meaningful deliberation or premeditation and he was not capable of forming an intent to kill. If this testimony was believed by the jury, the conviction of second degree murder was fully justified on the basis of diminished capacity.

We also reject Maine's unfounded argument that his second degree murder conviction is not supported by substantial evidence. Contrariwise, we are strongly persuaded that upon the record developed at the trial the jury would have been warranted in finding him guilty of first degree murder. Thus, he falls within the well settled rule that a defendant cannot complain of a finding by the jury which is more favorable than the law and the evidence warrant (*People* v. *De Priest* (1969) 2 Cal.App.3d 423, 431-432 [82 Cal.Rptr. 526]; *People* v. *Finch* (1963) 213 Cal.App.2d 752, 777 [29 Cal.Rptr. 420]).

d) *Propriety of Multiple Punishment:*

Maine's final argument is that the trial judge violated the prohibition against multiple punishment by sentencing him separately for the murdering and kidnaping of Tim and the raping and kidnaping of Susan and by ordering the sentences to run consecutively. There is no substance to this contention.

Section 654 of the Penal Code[5] prohibits the imposition of multiple

---

[4] It is worthy of note that the court gave the following instruction among others to the jury: "If you find that Mr. Maine has taken part in the kidnaping, is guilty of kidnaping, and [if] you find that the killing was done in the perpetration or the attempt to perpetrate kidnaping, you must find Mr. Maine guilty of murder in the second degree."

[5] Penal Code, section 654, provides in pertinent part that "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; . . ."

punishment if the basis of the multiple conviction is a *single act or a course of criminal conduct* committed or engaged in *with a single objective*. Under such circumstances the defendant may be punished only for the more serious offense (*People* v. *Beamon* (1973) 8 Cal.3d 625 [105 Cal.Rptr. 681, 504 P.2d 905]; *People* v. *Diaz* (1967) 66 Cal.2d 801, 806 [58 Cal.Rptr. 729, 427 P.2d 505]; *In re Ward* (1966) 64 Cal.2d 672, 675-676 [51 Cal.Rptr. 272, 414 P.2d 400]). Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of Penal Code, section 654, is determined by the *intent* and *objective* of the actor (*People* v. *Diaz, supra,* at p. 807; *Neal* v. *State of California* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839]).

When viewed in the light of the preceding test, the trial court's finding that appellants' acts consisted of a series of divisible acts, each of which had been committed with a separate intent and objective is clearly supported by the evidence. Thus, the separate sentences for Tim's kidnaping and murder are justified on the basis that the kidnaping did not serve as a mere incident to the perpetration of murder but was committed for financial considerations. This is evidenced by the fact that Tim was robbed of his wallet and $6. That Maine was correctly sentenced for both kidnaping and raping Susan is even clearer, since the record virtually compels the conclusion that the intent to rape did not arise until after the kidnaping. This is underlined by the circumstance that appellants traveled some 200 miles and stopped in the interim for dinner before they reached the motel where the rapes occurred; that during this long journey there was no discussion of rape but rather a conversation indicating that appellants were contemplating ransom from Susan's parents. Since these facts support the conclusion that the intent to rape was formed after the kidnaping, the trial judge correctly sentenced Maine for both kidnaping and rape (cf. *In re Ward, supra,* at pp. 677-678; *People* v. *Jackson* (1967) 255 Cal.App.2d 584 [63 Cal.Rptr. 359]).

We finally note that Maine's argument that this court should vacate the imposition of sentence on all but the second degree murder (which carries the heaviest penalty) because all the offenses were incidental to the main objective of Susan's rape must be rejected on the additional ground that under well established law, Penal Code, section 654, does not apply where, as here, the acts have two results, each of which involves violence against a separate individual (*People* v. *Massie* (1967) 66 Cal.2d 899, 908 [59 Cal.Rptr. 733, 428 P.2d 869]; *People* v. *Ridley* (1965) 63 Cal.2d 671 [47 Cal.Rptr. 796, 408 P.2d 124].)

The judgment as to Braun, insofar as it provides for the penalty of death, is modified to provide in place of the death penalty a punishment of life

imprisonment and as so modified is affirmed in all respects. The judgment as to Maine is affirmed.

Taylor, P. J., and Rouse, J., concurred.

The petition of appellant Braun for a hearing by the Supreme Court was denied March 8, 1973.